551 S.E.2d 674

**STATE of West Virginia ex rel. BRANDON L. and Carol Jo L., Petitioners,**

v.

**Honorable Alan D. MOATS, Judge of the Circuit Court of Barbour County, and Linda K.S. and Richard S., Respondents**

No. 29288.

Supreme Court of Appeals of West Virginia.

Submitted June 5, 2001.

Decided July 6, 2001.

---

Scott A. Curnutte, Elkins, for the Petitioners.

David W. Hart, Elkins, for the Respondents, Linda K.S. and Richard S.

Chaelyn W. Casteel, Clagett & Gorey, Phillipi, Guardian Ad Litem for Alexander L.

ALBRIGHT, Justice.

Petitioners Brandon L. and Carol Jo. L.,[1] the adoptive stepfather and the natural mother of Alexander David L., a minor child, seek a writ of prohibition to prevent enforcement of the September 22, 2000, order of the Circuit Court of Braxton County directing that an evidentiary proceeding be held before the family law master in connection with the petition filed by Respondents Linda K.S. and Richard S. (hereinafter referred to as "Respondents"), the paternal grandparents, through which they sought visitation with Alexander David. Petitioners contend that Respondents have no standing to seek visitation rights under the provisions of this state's grandparent visitation statutes (herein referred to as the "grandparent act" or the "act"), West Virginia Code §§ 48–2B–1 to – 12 (1998) (Repl.Vol.1999),[2] and that the provisions of the act amount to an unconstitutional deprivation of their liberty interest with regard to issues of care, custody, and control of their child. Upon a thorough review of the issues raised herein, we find no constitutional infirmities with the grandparent act and conclude that Petitioners have not demonstrated the necessary requisites for the issuance of a writ of prohibition. Accordingly, we deny their request for extraordinary relief.

## I. Factual and Procedural Background

The birth parents of Alexander David, Petitioner Carol Jo L. and David Allen C., were divorced by order entered on December 22, 1998. Carol Jo L. was awarded sole care, custody, and control of Alexander David while David Allen C. was awarded visitation rights.[3] The divorce order expressly provided that the visitation rights awarded to David Allen C. were to be exercised under the supervision of David Allen C.'s mother— Respondent Linda K. S.[4] Pursuant to the divorce order, Respondent Linda K. S.[5] supervised the visitation of David Allen C. with his son and continued the relationship she and her husband had developed and maintained with Alexander David since birth. Respondents represent, and Petitioners do not dispute, that the visitation permitted under the divorce order "turned out to be visitation by Linda and Richard S. . . . with very little, if any, participation by the child's natural father, David Allen C." This visitation arrangement between Alexander David and his paternal grandparents continued even after the marriage of Petitioners Carol Jo L. and Brandon L. on February 25, 2000. When, however, the adoption of Alexander David by his step-parent, Petitioner Brandon L., became effective on May 11, 2000,[6] Carol

---

1. See In re Jonathan P., 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989) (discussing practice of this Court to identify parties in sensitive cases by initial only).

2. The Legislature recodified the statutes involving domestic relations matters by enactment of Enrolled Committee Substitute for House Bill 2199, which was effective from its passage on March 22, 2001. The pertinent recodification of the grandparent visitation act, which is now found in West Virginia Code §§ 48–10–101 to – 1201, did not alter the language of the statutory provisions under consideration.

3. Visitation was granted to David Allen C. under "Schedule A," which involves alternate weekends, rotating holidays, and extended summer visitation for the non-custodial parent.

4. The order of divorce does not establish any rights of visitation between Respondents and Alexander David.

5. While the divorce order states that Respondent Linda K.S. is the supervising adult, we assume that Respondent Richard S. was present during the visitations based on the fact that the visitations took place in Respondents' home.

6. Petitioners undertook the necessary procedures to have Alexander David adopted by his stepfather, Brandon L. Carol Jo L. executed a parental consent for adoption on March 1, 2000, and David Allen C. executed his parental consent for adoption on March 2, 2000. By order entered on May 11, 2000, the Circuit Court of Barbour County granted the adoption of Alexander David by his stepfather.

L. advised Respondent Linda K.S. by handwritten letter that "all of your grandparents rights and visitation are *cancelled, null and void.*" [7] (emphasis in original)

Respondents, who were completely unaware of the adoption proceedings until after the adoption was granted, filed an action in the circuit court on May 23, 2000, through which they sought visitation rights with Alexander David. Pursuant to a telephone conference held on June 12, 2000, the family law master considered Respondents' request for temporary visitation along with Petitioners' motion to dismiss, which was predicated on their argument that Respondents lacked standing under the grandparent act. Concluding that Respondents had no standing to pursue visitation rights, the family law master recommended dismissal of Respondents' petition. Respondents sought review of this recommended disposition before the circuit court and by order entered on September 22, 2000, the circuit court rejected the family law master's recommendation and recommitted the matter to the family law master for "a full hearing to determine whether the requested grandparent visitation would be in the best interests of the infant child and would not substantially interfere with the parent-child relationship, in accordance with the factors delineated in West Virginia Code § 48–2B–5 (1999)." Petitioners seek a writ of prohibition to prevent this matter from proceeding to the evidentiary hearing directed by the lower court.

## II. Standard of Review

■ Based on their contention that Respondents have no standing to seek visitation rights under the provisions of this state's grandparent act, Petitioners argue that the lower court had no jurisdiction to hear this matter. As we held in syllabus point three of *State ex rel. Hoover v. Berger,* 199 W.Va. 12, 483 S.E.2d 12 (1996), " 'Prohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers, and may

not be used as a substitute for [a petition for appeal] or certiorari.' Syl. Pt. 1, *Crawford v. Taylor,* 138 W.Va. 207, 75 S.E.2d 370 (1953)." As an alternate basis for the writ, Petitioners assert that the grandparent act is unconstitutional, both on its face and as applied to this case, citing their right to substantive due process. *See State ex rel. Wilmoth v. Gustke,* 179 W.Va. 771, n. 1, 373 S.E.2d 484, n. 1 (1988) (stating that "[p]rohibition may be used as a means to test the constitutionality of a statute"). We proceed to determine whether the lower court was acting within its jurisdictional grant when it entered the order from which this proceeding arises and whether the grandparent act is unconstitutional, either on its face or in application to this matter.

## III. Discussion

### A. Standing

■ After acknowledging that the grandparent act, by its own express declaration, is the exclusive statutory scheme for resolving issues of grandparent visitation, Petitioners conclude that only grandparents who have secured visitation rights *prior* to an adoption have standing under our statutory scheme. *See* W.Va.Code § 48–2B–1 (stating that "[i]t is the express intent of the Legislature that the provisions for grandparent visitation that are set forth in this article are exclusive"). As support for their contention that Respondents lack standing, Petitioners argue that West Virginia Code § 48–2B–9 governs the issue of whether Respondents can pursue visitation rights with their grandchild. That provision, which bears the heading "Effect of remarriage or adoption on visitation for grandparents," reads as follows:

(a) The remarriage of the custodial parent of a child does not affect the authority of a circuit court to grant reasonable visitation to any grandparent.

(b) If a child who is subject to a visitation order under this article is later

7. The letter continues to state that Davey (now Alexander David) "has a *new name,* a *new dad,* and *new grandparents*" and that "[a]t Daves [sic] request, you will *never* see Davey again." (emphasis in original) The biological father, David

Allen C., is purportedly opposed to contact between his son and Respondents because he "doesn't want [Alexander David] to turn out like . . . [he did]."

adopted, the order for grandparent visitation is automatically vacated when the order for adoption is entered, unless the adopting parent is a stepparent, grandparent or other relative of the child. W.Va.Code § 48–2B–9.

■ In viewing the provisions of section 9 of the grandparent act as determinative with regard to the issue of standing, Petitioners are clearly misguided. Standing to proceed under the act is addressed in section 3. That section states: "A grandparent of a child residing in this state may, by motion or petition, make application to the circuit court of the county in which that child resides for an order granting visitation with his or her grandchild." W.Va.Code § 48–2B–3. Under the statutory scheme of the act, there are no limitations on when a petition may be filed by a grandparent for the purpose of requesting visitation rights with a grandchild. By its terms then, section three of the act does not proscribe consideration of petitions seeking visitation to only pre-adoption situations.[8]

In concluding that Respondents had standing, the circuit court relied upon the provisions of section 4(b):

> The Court specifically finds that West Virginia Code § 48–2B–4(b) (1999) is the applicable statute which does provide the Petitioners with standing to petition for grandparent visitation. West Virginia Code § 48–2B–4(b) places no limitations on when or whether a grandparent(s) may petition the Court for visitation. In addition, although West Virginia Code § 48–2B–9(b) (1999) does not specifically address the situation, as in this matter, where no grandparent visitation order has been entered prior to an adoption of the infant child by a stepparent, the code section does not preclude a grandparent(s) from petitioning the Court for visitation.

While section 4(b) is not the provision that provides standing to Respondents, that section is nonetheless applicable because it governs the procedures to be employed in instances, like the case before us, where the visitation petition is not included as a part of another proceeding.

Section 4(b) of the act provides that:

> The provisions of this subsection apply when no proceeding for divorce, custody, legal separation, annulment or establishment of paternity is pending. A grandparent may petition the circuit court for an order granting visitation with his or her grandchild, regardless of whether the parents of the child are married. If the grandparent filed a motion for visitation in a previous proceeding for divorce, custody, legal separation, annulment or establishment of paternity, and a decree or final order has issued in that earlier action, the grandparent may petition for visitation if the circumstances have materially changed since the entry of the earlier order or decree.

In matters covered by section 4(b)—cases where no divorce, custody, legal separation, annulment or establishment of paternity proceeding is pending—the following procedures apply:

> (c) When a petition under subsection (b) of this section is filed, the matter shall be styled "In re grandparent visitation of [petitioner's(s') name(s) ]."

> (d) The court, on its own motion or upon the motion of a party or grandparent, may appoint a guardian ad litem for the child to assist the court in determining the best interests of the child regarding grandparent visitation.

W.Va.Code § 48–2B–4(c), (d).

Section 4(b) of the grandparents act along with subsections (c) and (d), address the procedural particulars involved in those instances when the petition seeking visitation is instituted separate from any ongoing domestic relations proceeding. A simple comparison of section 4(a),[9] which applies when there

---

8. In section III. B. of this opinion, however, we discuss how, under the statutory scheme of the act, visitation is not likely to be granted where it is first sought post-adoption except in those rare cases where a relationship has been both established and maintained between the grandparent(s) and child[ren] before the adoption was finalized.

9. Subsection (a) provides that:

> The provisions of this subsection apply to all proceedings for divorce, custody, legal separa-

are pending domestic relations proceedings, with section 4(b) demonstrates that the Legislature clearly contemplated that grandparents could seek visitation in instances where no other domestic relations type proceeding is pending. *Cf.* W.Va.Code § 48–2B–4(a), (b). Through the provisions of section 4(c) and (d), the Legislature went a step further and set forth how the pleadings are to be styled and authorized the appointment of a guardian ad litem[10] in cases such as the present one where the proceeding initiated under the grandparent act is separate from any other pending matter. *See* W.Va.Code § 48–2B–4 (c), (d).

Choosing to ignore the clear language of section 3, Petitioners rely exclusively on section 9(b) of the act in arguing that Respondents have no standing under the act. Petitioners suggest that, because this section does not reference instances where visitation rights have not been granted pre-adoption, no standing exists for any grandparent to seek visitation rights following an adoption if such rights were not previously established. This argument fails because section 9 expressly deals with the effect of remarriage or adoption on *established* visitation rights. In suggesting that the absence of language in section 9(b) addressing situations similar to Respondents defeats their right to seek visitation, Petitioners ignore the clear imperatives of sections 3 and 4(b), (c), and (d). *See* W.Va.Code §§ 48–2B–3, 4(b), (c), (d). There is no mention of *non-established* visitation rights in section 9 as that section is concerned only with *established* visitation rights. *See* W.Va.Code § 48–2B–9. The standing of a party to seek visitation rights, where no

such rights have previously been established, is addressed in section 3. *See* W.Va.Code § 48–2B–3.

While the language of section 9(b) does not address the issue of Respondents' standing, it demonstrates that the Legislature draws a distinction concerning issues of visitation depending on the type of adoption involved. Section 9(b) makes clear that the Legislature both contemplated and approved the continuation of visitation rights following an adoption in those instances where the adoption occurs within the immediate family, as opposed to outside the family.[11] In providing that visitation rights which are established preadoption are not to be affected by an adoption that occurs when the adopting parent is a stepparent, grandparent, or other relative of the child, the Legislature was both recognizing the difference between adoptions that occur within and without the immediate family and expressing a preference of continuing established relationships between children and their grandparents in the former instance. Understandably, adoptions that take place outside the immediate family do not permit, nor perhaps should they, the continuation of visitation rights that were granted pre-adoption. *See* W.Va.Code § 48–2B–9(b). In contrast, however, adoptions that take place within the family do not automatically result in the complete extinguishment of established visitational relationships between adoptive children and their grandparents under the act. *See id.*

Respondents argue that the absence of language in the act which addresses their specific circumstances, rather than being an

10. The lower court appointed a guardian ad litem in this case.

11. Respondents suggest in their brief that the language of section 9(b) "does, at the very least, imply that grandparents should not be denied visitation with their grandchild where the adopt-

tion, annulment or establishment of paternity. After the commencement of the proceeding, a grandparent seeking visitation with his or her grandchild may, by motion, apply to the circuit court for an order granting visitation. A grandparent moving for an order of visitation will not be afforded party status, but may be called as a witness by the court, and will be subject to cross-examination by the parties. W.Va.Code § 48–2B–4(a).

ing parent is a step-parent." In our opinion, the implication that can be drawn from section 9(b) is not that visitation should never be denied in such instances, but that visitation rights that have not previously been established, rather than being summarily extinguished, should be considered upon proper petitioning. Any determination regarding the granting of such rights must be made within the statutory requirements set forth in section five. *See* W.Va.Code § 48–2B–5 (stating that visitation can only be granted where it is jointly determined to be in the best interest of the child and not to substantially interfere with the parent-child relationship and delineating thirteen factors to aid such determinations).

indication of legislative intent to deny them standing, is just the opposite. As analogous support for this contention, Respondents discuss this Court's decision in *Elmer Jimmy S. v. Kenneth B.*, 199 W.Va. 263, 483 S.E.2d 846 (1997), in which we held that visitation could be granted following the termination of the parental rights of the child of the petitioning grandparents where the prior grandparent act, West Virginia Code 48–2B–1 to –9 (1992), was silent with regard to what effect termination of parental rights had on grandparent visitation. The reasoning employed in *Kenneth B.* was essentially that, while the Legislature could have provided for the cessation of grandparent visitation rights upon a termination of parental rights for abuse or neglect, the absence of law expressly disallowing visitation upon such a termination of rights suggested that the Legislature did not intend to prohibit visitation in all such instances. *199 W.Va. at 267, 483 S.E.2d at 850.* While *Kenneth B.* does stand for the proposition that the absence of legislation denying visitation may, in some instances, be construed as an indirect indication of legislative approval for visitation, we find it unnecessary to rely upon *Kenneth B.* as support for our conclusion that standing exists in this case. Based on our determination that section 3 is the singular provision that governs whether a grandparent has standing under the act, we do not have to rely upon the nonexistence of language in the act which expressly governs visitation rights sought in the first instance following an adoption. *See also Troxel v. Granville*, 530 U.S. 57, 60, 62, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (noting that Washington statutory language which read "[a]ny person may petition the court for visitation rights at any time" gave grandparents standing to seek visitation "irrespective of whether a custody action was pending").

In a final attempt to defeat Respondents' standing to pursue visitation rights with their grandchild, Petitioners go outside the act to a statutory provision contained in the adoption statutes. The specific statute upon which Petitioners rely is West Virginia Code § 48–4–11 (1984) (Repl.Vol.1999), which provides, in pertinent part, that:

(a) *Upon the entry of such order of adoption, any person previously entitled to parental rights, any parent or parents by any previous legal adoption, and the lineal or collateral kindred of any such person, parent or parents, except any such person or parent who is the husband or wife of the petitioner for adoption, shall be divested of all legal rights,* including the right of inheritance from or through the adopted child under the statutes of descent and distribution of this State, and shall be divested of all obligations in respect to the said adopted child, and the said adopted child shall be free from all legal obligations, including obedience and maintenance, in respect to any such person, parent or parents. *From and after the entry of such order of adoption, the adopted child shall be, to all intents and for all purposes, the legitimate issue of the person or persons so adopting him or her and shall be entitled to all the rights and privileges and subject to all the obligations of a natural child of such adopting parent or parents.*

W.Va.Code § 48–4–11 (emphasis supplied).

Despite the express language of section one of the act, which declares in unmistakably clear terms, that the subject grandparent act, which was enacted in 1998,[12] is the *"exclusive"* legislation with regard to the issue of visitation, Petitioners nonetheless maintain that the adoption statutes are controlling on the issue of grandparent visitation. W.Va.Code § 48–2B–1 (emphasis supplied); *see also Kenneth B.*, 199 W.Va. at 266, 483 S.E.2d at 849 (emphasizing identical language contained in the 1992 grandparents act stating that the act was "exclusive" with regard to visitation before resolving whether termination of parental rights had affect on correspondent grandparent's right to visita-

12. There were two earlier versions, one enacted by Acts 1980, ch. 24 (W.Va.Code § 48–2B–1), and a second one enacted by Acts 1992, ch. 53 (W.Va.Code § 48–2B–1 to –9) and amended by Acts 1994, ch. 46. In annotations, the editors of the West Virginia Code state that the new provisions [1998 enactments] are "sufficiently different [such] that a detailed explanation of the changes and the retention of historical citations from the former law were impracticable." The same editorial explanation was provided in reference to the 1992 enactments.

tion). The adoption statute at issue was first enacted in 1882 and was last amended in 1984. Because the subject matter of grandparent visitation is one of relatively recent vintage, 1980 in this state,[13] there can be little question that the enactment in 1882 of West Virginia Code § 48–4–11, which is directed at the divestment of rights to a child upon the entry of an adoption order, was not written with concern for the correlative divestment of a grandparent's rights to visitation. Of further significance is the fact that the last amendments to West Virginia Code § 48–4–11 occurred in 1984. Since that time, the Legislature has twice enacted legislation dealing with the issue of grandparent visitation and has included, in both of those enactments, identical language indicating that those statutory enactments are the "exclusive" law on the subject matter. *See* W.Va. Code § 48–2B–1 (1992); W.Va.Code 48–2B–1 (1998).

 Even if we were to conclude that the act and West Virginia Code § 48–4–11 were in conflict, which we do not, the rules of statutory construction would nonetheless require that we resolve the issue based on the specific language set forth in the grandparent act, rather than under the general statutory language that appears within the adoption statutes. As we recognized in syllabus point one of *UMWA by Trumka v. Kingdon,* 174 W.Va. 330, 325 S.E.2d 120 (1984), "[t]he general rule of statutory construction requires that a specific statute be given precedence over a general statute relating to the same subject matter where the two cannot be reconciled." *See also, Cropp v. State Workmen's Compensation Comm'r,* 160 W.Va. 621, 626, 236 S.E.2d 480, 484 (1977) (stating that "[i]t is an accepted rule of statutory construction that where a particular section of a statute relates specifically to a particular matter, that section prevails over another section referring to such matter only incidentally"); Syl. Pt. 2, *State ex rel. Myers v. Wood,* 154 W.Va. 431, 175 S.E.2d 637 (1970)

("A specific section of a statute controls over a general section of the statute."). Because the grandparent act is specific legislation drafted and adopted for the express purpose of addressing the issue of visitation, its provisions must necessarily be viewed as controlling when a question arises regarding the application of another code provision with regard to the issue of grandparent visitation.

 In a case decided before the adoption of the current grandparent act, *In re Nearhoof,* 178 W.Va. 359, 359 S.E.2d 587 (1987), we addressed the precise issue that Petitioners raise in this case: whether West Virginia Code § 48–4–11 and the grandparent act then in existence [14] were in conflict based on the identical language relied upon by Petitioners to argue that Respondents' legal rights were extinguished coterminous with the adoption. At issue in *Nearhoof* was whether the adoption of a grandchild by his stepmother resulted in the termination of visitation rights that were petitioned for and obtained by the maternal parents of the child's deceased mother pre-adoption. 178 W.Va. at 360–61, 359 S.E.2d at 588–89. While the grandparent visitation statute then in effect provided for visitation where the child of the petitioning grandparents was deceased, it was not clear what effect the adoption of a child had on a grandparent's right to continue an established grant of visitation rights. *See* W.Va.Code § 48–2B–1 (1980). After examining the decisions of three other states on this very issue, we concluded that rather than being in conflict, the adoption and grandparent statutes had the same underlying objective: "[T]o provide substitute parental relationships for children who have been deprived of the benefits of a healthy relationship with one or both natural parents." 178 W.Va. at 363, 359 S.E.2d at 591. Rather than viewing the language of West Virginia Code § 48–4–11 as prohibitive of grandparent visitation, we determined that "the legislature intended to vest in the trial court exclusive discretionary authority to

---

**13.** *See* W.Va.Code § 48–2B–1 (1980) (allowing grandparent visitation only in those instances when child of grandparent is deceased).

**14.** Because *Nearhoof* involved the issue of which set of statutes was controlling—grandparent act

or adoption statute—the fact that the grandparent act in effect at the time is a different version than the present statutory scheme is of no import with regard to the applicability of the *Nearhoof* ruling to the case before us.

grant grandparents' visitation rights pursuant to *W.Va.Code,* 48–2B–1 ...." 178 W.Va. at 363, 359 S.E.2d at 591. As further support for our decision in *Nearhoof,* we observed that "had the legislature intended the adoption statute to limit the statute providing for grandparents' visitation, the statutes could have reflected that intention." *Id.* at 364, 359 S.E.2d at 592. In concluding, we stated that: "[T]he availability of the grandparent visitation mechanism is not limited to the nonadoptive custodial setting. We do not believe that the legislature intended to permit the statutorily granted right of grandparent visitation to be frustrated by the otherwise beneficient [sic] provisions of the adoption statute." *Id.*

We find significant the fact that, despite the passage of fourteen years since the *Nearhoof* decision, the Legislature has yet to enact legislation expressly denying grandparent visitation following adoptions. Rather than enacting such prohibitory legislation, the Legislature has expressed a clear preference, through the proviso language included in section 9(b), for continuing established visitation rights where an adoption involves a "stepparent, grandparents, or other relative." W.Va. Code § 48–2B–9(b). This enactment illustrates the Legislature's recognition "that under certain limited circumstances, grandparents should have continuing contacts with their grandchild's development." *Nearhoof,* 178 W.Va. at 364, 359 S.E.2d at 592. The reasons for such continuing contact are many, as we recognized in *Nearhoof:*

> It is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and

their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. Neither the Legislature nor this Court is blind to human truths which grandparents and grandchildren have always known.

178 W.Va. at 364, 359 S.E.2d at 592 (quoting *Mimkon v. Ford,* 66 N.J. 426, 332 A.2d 199, 204–05 (1975)). Having found no statutory impediment to the issue of standing, we proceed to determine whether a constitutional defect prevents implementation of the grandparent act.

## B. Constitutionality of Grandparents Act

■ Petitioners assert that the grandparent act is unconstitutional, on its face and in application, based on the recent ruling of the United States Supreme Court in *Troxel.* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49. Under consideration in *Troxel* was the following broadly worded two-sentence statute: "Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances." Wash. Rev.Code § 26.10.160(3) (1994). While agreeing with the Washington Supreme Court's conclusion that the grandparent visitation provision unconstitutionally infringed on a parent's right to rear his/her children, the United States Supreme Court repeatedly articulated that its finding of unconstitutionality resulted from the manner in which the Washington statute was applied and was *not* a ruling that the Washington statute, or all such statutes providing for non-parental visitation, are unconstitutional *per se.* 530 U.S. at 73, 120 S.Ct. 2054.

After discussing the underlying basis of the liberty interest [15] that is implicated with

---

**15.** The source of this liberty interest is the Fourteenth Amendment's proscription on depriving "any person of life, liberty, or property." *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054; *see also Santosky*

*v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"). This

a parent's rights concerning the care, custody, and control of her children, the Court proceeded to consider what had ensued in the *Troxel* case. In response to the paternal grandparents' request that they be granted visitation rights with their two granddaughters,[16] the trial court, based mostly on his own positive experiences as a child,[17] determined that it would be in the best interests of the children to have expanded contact with their grandparents and ordered that the grandparents could have one weekend of visitation per month, one week in the summer, and time on both of the petitioning grandparents' birthdays. 530 U.S. at 71, 120 S.Ct. 2054.

In attacking the trial court's ruling in *Troxel*, the Supreme Court heavily criticized the lower court's alteration of the burden of proof:

> The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's [mother's] determination of her daughters' best interests. More importantly, it appears that the Superior Court applied exactly the opposite presumption. . . . In effect, the judge placed on Granville, the fit custodial parent, the burden of *disproving* that visitation would be in the best interest of her daughters.

Court has recognized the existence of a liberty interest with regard to various issues concerning the parent/child relationship. *See State ex rel. Jeanette H. v. Pancake*, 207 W.Va. 154, 161, 529 S.E.2d 865, 872 (2000) (stating that "it is . . . well established that a parent has a constitutionally protected liberty interest in retaining custody of his or her child and is, therefore, entitled to certain due process protections when the State seeks to terminate the parent/child relationship"); *Overfield v. Collins*, 199 W.Va. 27, 34, 483 S.E.2d 27, 34 (1996) (recognizing that natural parent "acquires a liberty interest in maintaining a substantial parental relationship with her children vis-à-vis third parties"); *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 631–33, 474 S.E.2d 554, 561–63 (1996) (recognizing that liberty, within meaning of Due Process Clause, embraces rights of parenthood and holding that father had liberty interest in maintaining established parent-child relationship, regardless of whether relationship was within traditional and official parameters); Syl. Pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973) (holding that "[i]n the law concerning custody of minor chil-

530 U.S. at 69, 120 S.Ct. 2054. Rather than requiring the grandparents to prove that visitation would be in the best interests of the children, the trial court reversed this burden and imposed it on the children's mother, the non-petitioning party.

Also critical to the ruling in *Troxel* was the failure of the Washington Supreme Court to give the statute at issue a more narrow interpretation. The high Court found disfavor with the fact that the Washington statute "contains no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever." 530 U.S. at 67, 120 S.Ct. 2054. The Supreme Court also disliked the fact that the Washington statute, unlike the West Virginia act, was so broadly written that it applied to any third party and was not limited to grandparents or other parties who had a specific relationship with the child[ren] in issue. *Id.* Given the absence of any limiting factors within the statute or any interpretational limitations imposed by the Washington Supreme Court, the Court in *Troxel* was concerned with the inevitability of a judge imposing his own "best interest" standard and totally disregarding the stated preferences of the parent where there had been no showing of unfitness with regard to that parent. *Id.*

Despite all these shortcomings—a broadly written statute that provided for no consider-

dren, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions").

16. The mother of the children wanted to limit the grandparents to one short visit per month and special holidays. In their petition, the grandparents sought to obtain visitation rights comprised of two weekends per month and two full weeks in the summer.

17. The trial court opined that:

> "I look back on some personal experiences . . . . We always spen[t] as kids a week with one set of grandparents and another set of grandparents, [and] it happened to work out in our family that [it] turned out to be an enjoyable experience. Maybe that can, in this family, if that is how it works out."

530 U.S. at 72, 120 S.Ct. 2054.

ation of the parent's preferences and which permitted the trial court to apply whatever factors the trial court deemed appropriate in determining the pivotal issue of best interests—the United States Supreme Court did not conclude that the Washington statute was unconstitutional *per se,* but only as applied to the facts of that particular case. Explaining its decision, the Court stated:

Because we rest our decision on the sweeping breadth of § 26.10.160(3) and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. In this respect, we agree with Justice Kennedy that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.' *Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific non-parental visitation statutes violate the Due Process Clause as a per se matter.*

530 U.S. at 73, 120 S.Ct. 2054 (emphasis supplied).

After discussing the deficiencies of the Washington statute with regard to its "fail[ure] to provide any protection for Granville's [mother's] fundamental constitutional right to make decisions concerning the rearing of her own daughters," the United States Supreme Court identified, with seeming approval, the statutes of seven other states and noted specific language contained in those statutes that stood in contrast to the Washington statute. *See Troxel,* 530 U.S. at 70, 120 S.Ct. 2054, *citing, inter alia,* Me.Rev. Stat. Ann. 19A § 1803(3) (1998) (providing that court may award grandparent visitation if in best interest of child and if it "would not significantly interfere with any parent-child

relationship or with the parent's rightful authority over the child"); Minn.Stat. § 257.022(2)(a)(2) (1998) (providing that court may award grandparent visitation if in best interest of child and "such visitation would not interfere with the parent-child relationship"); Neb.Rev.Stat. § 43–1802(2) (1998) (requiring that court must find "by clear and convincing evidence" that grandparent visitation "will not adversely interfere with the parent-child relationship").

The West Virginia statutory scheme stands in stark contrast to the simplistic and broadly-worded two-sentence Washington statute scrutinized in *Troxel.* As an initial matter, our statute does not permit just "any person" to file a petition under the act. *See* W.Va. Code § 48–2B–3 (providing that only grandparents can seek visitation under W.Va. act). In addition to setting forth the axiomatic standard of best interests by which any visitation decisions are to be made under the act, section five of our act requires a correspondent affirmative determination that such visitation "would not substantially" interfere with the parent-child relationship." W.Va.Code § 48–2B–5(a). As an aid to making this joint determination of best interests and lack of substantial interference with the parent-child relationship, the Legislature has delineated twelve specific and one general factor for the trial court's consideration of this weighty issue. Those factors are:

(1) The age of the child;

(2) The relationship between the child and the grandparent;

(3) The relationship between each of the child's parents or the person with whom the child is residing and the grandparent;

(4) The time which has elapsed since the child last had contact with the grandparent;

(5) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;

(6) If the parents are divorced or separated, the custody and visitation arrangement which exists between the parents with regard to the child;

(7) The time available to the child and his or her parents, giving consideration to

such matters as each parent's employment schedule, the child's schedule for home, school and community activities, and the child's and parents' holiday and vacation schedule;

(8) The good faith of the grandparent in filing the motion or petition;

(9) Any history of physical, emotional or sexual abuse or neglect being performed, procured, assisted or condoned by the grandparent;

(10) Whether the child has, in the past, resided with the grandparent for a significant period or periods of time, with or without the child's parent or parents; or

(11) Whether the grandparent has, in the past, been a significant caretaker for the child, regardless of whether the child resided inside or outside of the grandparent's residence.

(12) **The preference of the parents with regard to the requested visitation;** and

(13) Any other factor relevant to the best interests of the child.

W.Va.Code § 48–2B–5(b)(1)–(13) (emphasis supplied). A final significant difference between our statute and the Washington statute is the inclusion of a burden of proof standard requiring grandparent(s) seeking visitation to prove by a preponderance of the evidence that the requested visitation "is in the best interest of the child." W.Va.Code § 48–2B–7(a), (c).

In light of these extensive and significant improvements over the Washington statute, we find Petitioners' statement that "[e]ach of the deficiencies the Supreme Court identified in the Washington statute is present in W.Va.Code § 48–2B–1, *et seq.*" to be without merit. Placing unwarranted importance on the numerical placement of parental preference as the twelfth factor for the trial court's consideration, Petitioners first suggest that this placement denotes a lessening of the factor's constitutional significance. In addition, Petitioners argue that the location of parental preference towards the bottom of the list somehow indicates that this particular factor is a co-equal factor to be weighted equally with the other twelve factors. Unlike Petitioners, we find nothing in the legislative delineation of these factors in section 5 of the act that suggests either that the factors are to be given equal weight or that a parent's preference on the issue of visitation is not to be accorded any enhanced consideration. In reviewing the Washington statute in *Troxel,* the United States Supreme Court suggested that if the Washington Supreme Court had interpreted the statute at issue in a narrower fashion the high Court's ruling of unconstitutionality might have been avoided. 530 U.S. at 67, 120 S.Ct. 2054. While the instant petition for a writ of prohibition does not present the opportunity for us to determine the amount of weight that should attach to the factor of parental preference,[18] we note that in light of the *Troxel* decision it is clear that "the court must accord at least some special weight to the parent's own determination" provided that the parent has not been shown to be unfit. 530 U.S. at 70, 120 S.Ct. 2054.

After comparing the provisions of our grandparent act with the flaws identified by the Court in *Troxel,* we conclude that the act, by its terms, does not violate the substantive due process right of liberty extended to a parent in connection with his/her right to exercise care, custody, and control of his/her child[ren] without undue interference from the state. *See Troxel,* 530 U.S. at 65–66, 120 S.Ct. 2054. Our statutory scheme addresses almost every concern addressed by the Court in *Troxel* and many of those concerns are alleviated outright by the overarching standard that requires all visitation decisions to be reached by applying a two-prong standard of best interests and lack of substantial interference with the parent-child relationship. *See* W.Va.Code § 48–2B–5(a). Moreover, we are convinced that the Legislature both anticipated and provided for the proper consideration of the parent's liberty interest within the parameters of the *Troxel* ruling. This is

---

**18.** Petitioners criticize the circuit court for not affording the requisite level of deference to their preference on the issue of visitation. It is premature, however, for Petitioners to argue that the lower court has ignored their preference on the issue as no evidentiary proceeding has taken place which would require the lower court's consideration of the factors set out in section five of the act. *See* W.Va.Code 48–2B–5.

demonstrated both by the listing of parental preference as a factor that directly bears on the issue of visitation and, perhaps even more importantly, by the legislatively-imposed requirement that any grant of visitation must be preceded by an express affirmative finding that the visitation "w[ill] not substantially interfere with the parent-child relationship." *Id.* Thus, because our act expressly requires consideration of parental preference and because no grant of visitation can be accomplished without an initial determination that such visitation will not detrimentally affect the parent-child relationship, the constitutional deficiencies presented by the Washington statute at issue in *Troxel* are not present here. Accordingly, we reject Petitioners' suggestion that the act is constitutionally deficient on its face given the inclusion of parental preference within a list of other factors for the trial court's consideration on the issue of visitation. And, given the procedural phase of this matter, we have no basis from which to make any finding that the act is unconstitutional in application since the statutory provisions under discussion have yet to be applied to reach any determination as to the ultimate issue of visitation.

Although we find no impediment to Respondents' standing and thus to enforcement of the lower court's order directing that the matter proceed to an evidentiary hearing, we wish to make clear that our decision on standing has no bearing on the more difficult issues yet to be resolved: whether an award of visitation is in the best interests of the child and will not substantially interfere with the parent-child relationship. *See* W.Va. Code § 48–2B–5. While the Legislature has

clearly opened the courthouse doors in granting circuit courts jurisdiction to consider petitions for grandparent visitation, the Legislature has also enumerated a considerable set of factors that bear on this weighty issue of visitation. *See id.* One of those factors, which is deserving of discussion today, and which has been used by this Court in resolving issues of contact between children and relatives in various domestic settings, is whether there has been an established relationship between the child and his/her relative prior to the subject litigation.[19] *See* W.Va.Code § 48–2B–5(b)(2). Obviously, a grandparent who has an established relationship with his/her grandchild will be in a better position when the trial court is asked to rule upon the issue of visitation, than one who has just appeared out of the blue, or with little history of contact, and is now seeking to gain visitation rights.[20] As the Supreme Court recognized in *Troxel,* the motivating factor for the creation of grandparent visitation statutes was a legislative recognition of the societal need "to ensure the welfare of the children therein by protecting the relationships those children form with . . . third parties" such as grandparents. 530 U.S. at 64, 120 S.Ct. 2054. And underpinning all of these statutes is "a recognition, which varies from State to State, that children should have the opportunity to benefit from relationships with statutorily specified persons—for example, their grandparents." 530 U.S. at 64, 120 S.Ct. 2054; *see also Kessel v. Leavitt,* 204 W.Va. 95, 197, 511 S.E.2d 720, 822 (1998) (stating that "[i]n recent years, the recognized rights of grandparents have continued to expand through

---

**19.** *See, e.g., State ex rel. Virginia M. v. Virgil Eugene S. II,* 197 W.Va. 456, 462, 475 S.E.2d 548, 554 (1996) (directing circuit court on remand that no matter who becomes child's primary custodian, "he has the right to a continued relationship with both his grandmother and his mother"); Syl. Pt. 2, in part, *Roy Allen S.,* 196 W.Va. 624, 474 S.E.2d 554 (1996) (holding that "although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so"); *Kenneth L.W. v. Tamyra S. W.,* 185 W.Va. 675, 680, 408 S.E.2d 625, 630 (1991) (recognizing importance of stability and continuity in child's life in child custody setting and stating that "[t]his continuity

is especially important if a grandparent or other relative has been the caregiver"); *Honaker v. Burnside,* 182 W.Va. 448, 452–53, 388 S.E.2d 322, 325–26 (1989) (discussing need to provide for transition period in change of custody cases as well as the rights of visitation with a stepparent or half-sibling and stating that "[t]aking away continued contact with . . . important figures in . . . [a child's life] would be detrimental to her stability and well-being").

**20.** Especially in infant adoptions, where grandparents have had no opportunity to develop a relationship with the child, an application under the statute reviewed here would be futile.

both statutory definition and judicial interpretation"), *cert. denied*, 525 U.S. 1142, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1999). Despite this legislative recognition of the important role that grandparents can play in the lives of children, a grandparent who seeks to avail him or herself of this statutorily-granted mechanism for seeking visitation must be able to demonstrate that the visitation being sought will be in the best interest of the child[ren] and will not substantially interfere with the parent-child relationship. *See* W.Va.Code § 48–2B–5(a). This will be very difficult to do in cases where adoptions have preceded the petitions seeking visitation unless the petitioning grandparent[s] can demonstrate to the trial court's satisfaction, within the guidelines and standards established by the Legislature, that such visitation is likely to be a positive factor in the child's life and will not unduly disrupt the child's relationship with his/her parent(s). And, as we emphasized previously, in the absence of an established relationship between the grandparent[s] and the child[ren], it will be most difficult to meet the statutory standards imposed under the act.[21]

We perceive that the statutory scheme for grandparent visitation—which provides for two ultimate determinations by the trial court, related both to the best interests of the child[ren] involved and to the protection of the parent-child relationship from any *significant* interference—constitutes a workable means by which the legitimate interests of the child[ren] in maintaining a viable relationship with their grandparent[s] and the liberty interests of parents relative to the care, custody, and control of their children can be effectively examined, protected, and promoted. Under the statutory scheme

adopted by the Legislature, which provides for a hearing on the issue of whether reasonable visitation rights should be granted, there is no question that Respondents are entitled to present their evidence and be heard. We wish to emphasize that our ruling today has done nothing to change the availability of the court system to grandparents seeking visitation rights. Consistent with our obligation to uphold a legislative enactment as constitutional when at all possible, we have merely recognized the broad grant of standing[22] extended to grandparents by the Legislature under the act. *See* Syl. Pt. 1, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965) (stating that "[e]very reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question"). Thus, rather than making new law, we have merely interpreted the act's existing provisions in light of the pronouncements made by the United States Supreme Court in *Troxel*. And, as discussed in full above, we have found West Virginia's act to be well within the constitutional concerns addressed in *Troxel*, given the act's specific identification of parental preference as a factor that directly impacts on the issue of visitation. We note particularly that the grandparent visitation permitted by the Legislature here cannot be ordered by the circuit court without an affirmative finding that such visitation will not cause a substantial interference in the parent-child relationship, as well as an affirmative finding that such visitation meets the traditional test of serving the best interests of the child. In short, if the circumstances fail either prong of that legislatively-defined test, then the plea for

---

**21.** This is why we have considered and rejected the argument advanced by the dissent that our ruling in this case will have a chilling effect on adoptions. Adoptions that take place outside the immediate family are clearly beyond the scope of this opinion as the Legislature has made clear that visitation should not be continued in such instances. *See* W.Va.Code § 48–2B–9(b). And in those cases where adoptions occur within the immediate family and no visitation order was obtained pre-adoption, the issue of granting grandparent visitation is controlled by a host of factors that will result in awards of visitation

only in those rare instances where grandparents can demonstrate that such visitation is in the child's best interest and will not interfere with the parent-child relationship. We simply do not foresee either the end of adoptions or a consequential rash of ensuing litigation from grandparents seeking visitation rights as a result of this opinion.

**22.** The only limitation imposed under the act regarding the filing of a petition seeking visitation rights concerns where such petition can be filed.

grandparent visitation fails. *See* W.Va.Code § 48–2B–5(a).

While it would certainly be preferable for the adults involved in these visitation issues to reach an agreed and written accommodation, with or without the formal approval of a court order, we recognize that this will not always be the case. In those, hopefully few, cases where the matter cannot be resolved without a court deciding one or more of the issues, it appears to this Court that the statute under consideration provides a comprehensive and fair means by which the best interests of the child[ren] and the relationships with their respective parent[s] or grandparent[s] can be protected from harm resulting either from the inconsiderate or excessive demands of grandparents or the obstinate or unreasonable and *insignificant* objections of parents, any of which may, on occasion, be driven more by emotion than pursuit of the proper interests of the children and their parents. Because we recognize the likely sensitivity and difficulty of such circumstances, we urge the lower courts to be particularly attentive to the need for careful and complete findings of fact and conclusions of law when ruling on actions brought under this act. *See* W.Va.Code § 48–2B–8(a) (requiring written findings of fact and conclusions of law).

Finding no basis for issuing the requested writ of prohibition, we hereby deny Petitioners' request for extraordinary relief.

Writ denied.

DAVIS, Justice, dissenting.

Before the deliverance of the majority's decision herein, an order of adoption was considered to be a complete divestiture of an adoptee's former familial and legal ties and the creation of a unique adoptive family unit with correspondingly new legal relationships among those family members. The Opinion in the case *sub judice*, though, not only unsettles the once certain world of adoption, causing adoptees and adopters alike to constantly question the security of their court-established rights, it also contravenes the preeminent law of this State which dictates the applicability of new pronouncements of law. For these reasons, I respectfully dissent.

### A. Finality

The first source of contention I have with the majority's opinion is its resolute disregard of the heretofore understood force and effect of adoption orders: finality. "Finality is of the utmost importance in an adoption." *State ex rel. Smith v. Abbot,* 187 W.Va. 261, 266, 418 S.E.2d 575, 580 (1992). In this respect, it has been stated that

> [t]he most drastic and far-reaching action that can be taken by a court of equity is to enter a final order of adoption. Such an order severing the ties between a parent and a child is as final, and often as devastating, as though the child had been delivered at birth to a stranger instead of into the arms of his natural mother or father. Custody of children and child support are matters that remain within the breast of the court and are subject to change and modification so long as a child is a minor. *This is not true of adoptions.* Once an order of adoption becomes final, the natural parent is divested of all legal rights and obligations with respect to the child, and the child is free from all legal obligations of obedience and maintenance in respect to them. The child, to all intents and purposes, becomes the child of the person adopting him or her to the same extent as if the child had been born to the adopting parent in lawful wedlock.

14A Michie's Jurisprudence *Parent and Child* § 27, at 285 (2001) (emphasis added) (footnote omitted). These sentiments are echoed by the adoption law of this State which proclaims that

> [u]pon the entry of [an] order of adoption, any person previously entitled to parental rights, any parent or parents by any previous legal adoption, and the lineal or collateral kindred of any such person, parent or parents, except any such person or parent who is the husband or wife of the petitioner for adoption, shall be divested of all legal rights, including the right of inheritance from or through the adopted child under the statutes of descent and distribution of this State, and shall be divested of all obligations in respect to the

said adopted child, and the said adopted child shall be free from all legal obligations, including obedience and maintenance, in respect to such person, parent or parents. From and after the entry of such order of adoption, the adopted child shall be, to all intents and for all purposes, the legitimate issue of the person or persons so adopting him or her and shall be entitled to all the rights and privileges and subject to all the obligations of a natural child of such adopting parent or parents.

W. Va.Code § 48–4–11(a) (1984) (Repl.Vol. 1999). *Accord* W. Va.Code § 48–4–9(d) (1997) (Repl.Vol.1999). Likewise, the culmination of an adoption proceeding, which is evidenced by the order of adoption, is held to be inviolate, except in certain enumerated, and quite limited, circumstances:

(a) An order or decree of adoption is a final order for purposes of appeal to the supreme court of appeals on the date when the order is entered. An order or decree of adoption for any other purpose is final upon the expiration of the time for filing an appeal when no appeal is filed or when an appeal is not timely filed, or upon the date of the denial or dismissal of any appeal which has been timely filed.

(b) An order or decree of adoption may not be vacated, on any ground, if a petition to vacate the judgment is filed more than six months after the date the order is final.

(c) If a challenge is brought within the six-month period by an individual who did not receive proper notice of the proceedings pursuant to the provisions of this chapter, the court shall deny the challenge, unless the individual proves by clear and convincing evidence that the decree or order is not in the best interest of the child.

(d) A decree or order entered under this chapter may not be vacated or set aside upon application of a person who waived notice, or who was properly served with notice pursuant to this chapter and failed to respond or appear, file an answer or file a claim of paternity within the time allowed.

(e) A decree or order entered under this chapter may not be vacated or set aside upon application of a person alleging there is a failure to comply with an agreement for visitation or communication with the adopted child: Provided, That the court may hear a petition to enforce the agreement, in which case the court shall determine whether enforcement of the agreement would serve the best interests of the child. The court may, in its sole discretion, consider the position of a child of the age and maturity to express such position to the court.

(f) The supreme court of appeals shall consider and issue rulings on any petition for appeal from an order or decree of adoption and petitions for appeal from any other order entered pursuant to the provisions of this article as expeditiously as possible. The circuit court shall consider and issue rulings on any petition filed to vacate an order or decree of adoption and any other pleadings or petitions filed in connection with any adoption proceeding as expeditiously as possible.

(g) When any minor has been adopted, he or she may, within one year after becoming of age, sign, seal and acknowledge before proper authority, in the county in which the order of adoption was made, a dissent from such adoption, and file such instrument of dissent in the office of the clerk of the circuit court which granted said adoption. The clerk of the county commission of such county and the circuit clerk shall record and index the same. The adoption shall be vacated upon the filing of such instrument of dissent.

W. Va.Code § 48–4–12 (1997) (Repl.Vol. 1999).

As is evidenced by the above-quoted authorities, once the proceedings surrounding an adoption have been concluded, the ultimate import of the court's final order of adoption is just that——to serve as a final and complete resolution of the adoptee's former and forthcoming familial and legal relationships, thereby providing him/her with the comfort and knowledge of future certainty. Despite this legislatively intended result, however, the majority of this Court has, in just one Opinion, completely obviated the security attending the conclusion of adoption proceedings by allowing grandparents, who

had no prior order of visitation,[1] to petition the court for such an order at any time, even after the entry of a final adoption order.

By reaching the decision announced herein, the majority has permitted grandparents, in general, to petition courts for visitation with their *former* grandchildren after their familial relationship has been terminated as a result of the grandchild's adoption. *See* W. Va.Code § 48–4–11(a) (explaining change in familial relationships upon entry of final adoption order). As the adoption will have likewise divested these *former* grandparents of their kinship with their *former* grandchild, however, they simply would have no standing under the governing statutes to pursue such a claim—a simple observation which the Court's Opinion deftly ignores. *See id. See also* W. Va.Code § 48–2B–2(2) (1998) (Repl. Vol.1999) (defining "[g]randparent" as "a biological grandparent, a person married or previously married to a biological grandparent, or a person who has previously been granted custody of the parent of a minor child with whom visitation is sought", but omitting a *former* grandparent from such definition). I find this result to be particularly absurd considering the majority's lengthy discussion of the respondent grandparents' standing in the case *sub judice, see supra* Section III.A, and their ultimate finding of such standing in spite of the respondents' son's relinquish-

ment of his parental rights and their grandchild's subsequent adoption.

Moreover, my colleagues suggest, at the end of Section III.A of the majority Opinion, *supra*, that the Legislature could have amended the adoption statutes to address the present scenario and that their failure to do so necessitates reliance solely on the grandparent visitation statutes. *See* W. Va.Code § 48–2B–1 (1998) (Repl.Vol.1999) (providing that "[i]t is the express intent of the Legislature that the provisions for grandparent visitation that are set forth in this article are exclusive"). Neither do I agree with this conclusion. Rather, I am of the opinion that the long-standing rule of statutory construction resolves this quandary: *inclusio unius est exclusio alterius.* This doctrine, which means that " ' "one is the exclusion of the others[,]" . . . informs courts to exclude from operation those items not included in the list of elements that are given effect expressly by statutory language.' " *Keatley v. Mercer County Bd. of Educ.,* 200 W.Va. 487, 491 n. 6, 490 S.E.2d 306, 310 n. 6 (1997) (quoting *State ex rel. Roy Allen S. v. Stone,* 196 W.Va. 624, 630 n. 11, 474 S.E.2d 554, 560 n. 11 (1996)). *Accord State v. Lewis,* 195 W.Va. 282, 288 n. 12, 465 S.E.2d 384, 390 n. 12 (1995).

Because the adoption statutes at issue herein do, in fact, address the issue of grand-

---

1. This fact is significant as both the grandparent visitation statutes and the adoption laws suggest that a grandparent who has previously been granted visitation with his/her grandchild has at least nominal rights to continue such a relationship following the grandchild's adoption. *See* W. Va.Code § 48–2B–9 (1998) (Repl.Vol.1999) (noting, in subsection (a), that "[t]he remarriage of the custodial parent of a child does not affect the authority of a circuit court to grant reasonable visitation to any grandparent," but further admonishing, in subsection (b), that "[i]f a child who is subject to a visitation order under this article is later adopted, the order for grandparent visitation is automatically vacated when the order for adoption is entered, unless the adopting parent is a stepparent, grandparent or other relative of the child"); W. Va.Code § 48–4–8(a)(3) (1997) (Repl.Vol.1999) (requiring notice of adoption be given to "[a]ny person other than the petitioner . . . who has visitation rights with the child under an existing court order issued by a court in this or another state"); W. Va.Code § 48–4–12(e) (1997) (Repl.Vol.1999) (observing that "[a] decree or order [of adoption] may not be vacated or set aside upon application of a person alleging there is a failure to comply with an agreement for visitation or communication with the adopted child," but allowing "[t]hat the court may hear a petition to enforce the agreement, in which case the court shall determine whether enforcement of the agreement would serve the best interests of the child"). *But compare* W. Va.Code § 48–2B–3 (1998) (Repl.Vol. 1999) ("A grandparent of a child residing in this state may, by motion or petition, make application to the circuit court of the county in which that child resides for an order granting visitation with his or her grandchild.") *with* W. Va.Code § 48–2B–7(c) (1998) (Repl.Vol.1999) (suggesting that petition for grandparent visitation will not be granted in certain circumstances where "there is a presumption that visitation privileges need not be extended to the grandparent if the parent through whom the grandparent is related to the grandchild . . . exercises visitation privileges with the child that would allow participation in the visitation by the grandparent if the parent so chose").

parent visitation in adoption proceedings,[2] it seems to me that the Legislature's refusal to speak further on this topic indicates its decision to foreclose any further intervention in adoption proceedings by grandparents or other individuals who seek to assert a purported right to visitation with the adoptee. Given that the respondents' claim does not come within the rubric of intervenors contemplated by the adoption statutes, I would submit that they lack standing to pursue visitation with Alexander David and that the final order of adoption should be allowed to remain undisturbed by further proceedings that are not sanctioned by the governing statutory law.

### B. Prospective Application

The second issue on which I part company with my brethren herein is the proposed application of the instant Opinion. While my colleagues adhere to the belief that this decision should be given retroactive effect, the applicable law supports only the prospective application of the Court's holding. Typically, the prospective/retroactive dilemma is resolved through the contemplation of several factors:

In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. *Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, pro-*

*spective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity.* Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.

Syl. pt. 5, *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979) (emphasis added). Among these enumerated criteria, I am most concerned with the fourth and fifth factors which address the difficulties attending the majority's decision in this case insofar as it represents a dramatic departure from the existing statutory law regulating adoptions and grandparental visitation rights.

In the proceedings underlying the instant appeal, it appears that Alexander David's biological parents, Carol Jo L. and David Allen C., complied with the statutory requirements for obtaining consent to and giving notice of Brandon L.'s prospective adoption of his stepson. *See* W. Va.Code § 48–4–3 (1997) (Repl.Vol.1999) (delineating persons from whom consent to adopt is required); W. Va.Code § 48–4–8 (1997) (Repl.Vol.1999) (listing individuals entitled to notice of adoption proceedings). Nowhere in these statutes, however, is there a requirement that persons in the position of the respondent grandparents, who did not have any court-established rights to visitation with their grandson, must give their consent to such an adoption or be notified of the proceedings therein. Thus, it appears that the parties to Alexander David's adoption proceedings complied with the law then in existence and, as a result thereof, should have been able to enjoy the protections provided thereby upon their conclusion. *See, e.g.,* W. Va.Code § 48–4–11(a) (describing finality of adoption proceedings). The majority's decision in the case *sub judice,* though, usurps any reliance Carol Jo L., David Allen C., or Brandon L., not to mention Alexander David, could reasonably have placed upon the final resolution of Alex-

---

2. *See* W. Va.Code § 48–4–8(a)(3); W. Va.Code § 48–4–12(e). For a discussion of the pertinent language of these statutes see *supra* note 1.

ander David's adoption by creating, in the child's grandparents, rights not heretofore contained in the applicable statutory law.

By allowing retroactive application of the instant decision, the majority has effectively amended the statutory law governing both adoption and grandparents' visitation rights to include a class of grandparents never contemplated by either of these promulgations. Primarily, the consent and notice provisions of the adoption laws of this State are designed to shield parents and children alike from difficulties that may arise when persons who have protected interests have not been made parties to such proceedings. Perhaps no case in this Court's recent history illustrates this point more poignantly than *Kessel v. Leavitt*, 204 W.Va. 95, 511 S.E.2d 720 (1998), *cert. denied*, 525 U.S. 1142, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1999), wherein a biological mother's failure to notify her child's biological father of their son's adoption resulted in protracted litigation in this Court on claims of tortious interference and fraud nearly seven years after the child's birth and when the child's adoptive fate had long been sealed. As further insurance against late-asserted claims, the Legislature has additionally included within the list of those persons entitled to notice of adoption proceedings "[a]ny person ... who has visitation rights with the child under an existing court order issued by a court in this or another state." W. Va.Code § 48–4–8(a)(3). Similarly, in the off chance that such persons either have not been properly notified or that the visitation order has not been effective in securing visitation with the adoptee post-adoption, these individuals are allowed a rare opportunity to seek relief from the court in an otherwise finalized matter. *See* W. Va.Code § 48–4–12(e). When, however, the virtual floodgates are opened to allow grandparents, such as the respondents herein, to request visitation rights following the conclusion of adoption proceedings where they had no pre-existing right thereto, the scope of persons with protected interests contemplated by this State's adoption laws has been compromised and a novel application of the law has been created. Both of these results dictate giving the majority's Opinion prospective effect.

Moreover, the Court's decision herein drastically changes the scope of persons entitled to pursue visitation in accordance with the grandparents' visitation statutes. As I discussed in Section A., *supra*, the entry of a final order of adoption effectively changes the legal and familial relationships of the parties thereto by divesting the pre-adoption lineages and obligations and replacing them with ties indicative of the post-adoption state of affairs. Among the divestitures that take place in the course of an adoption are those of "the lineal or collateral kindred of any" person who was previously entitled to parental rights. W. Va.Code § 48–4–11(a). Thus, as a result of Brandon L.'s adoption of Alexander David, David Allen C.'s parental rights to his son were relinquished and those rights of his parents, the respondent grandparents, if any such rights existed, were likewise extinguished. The effect of the majority's holding, however, has been to miraculously restore the respondents's former kinship status as the child's grandparents upon the Court's decision to grant them standing to pursue their claims for visitation with their *former* grandson. Accordingly, then, the majority's Opinion will have the effect of expanding the Legislature's definition of a "grandparent" to include those persons who formerly enjoyed that status despite the subsequent adoption of their grandchild and their divestiture of such familial status by the statutes governing that adoption. *Cf.* W. Va.Code § 48–2B–2(2). Since this alteration in the grandparent visitation statutes also represents a dramatic departure from the previously established law in this field, the majority's pronouncement thereof should be applied prospectively only.

Accordingly, for the foregoing reasons, I respectfully dissent. I am authorized to state that Justice MAYNARD joins me in this dissenting opinion.