IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2019 Term

_____

No. 18-0167

_____

**FILED**
**November 18, 2019**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

MURRELL B. AND LINDA B.,
Petitioners

v.

CLARENCE R. AND NANCY R.,
Respondents

_____

Appeal from the Circuit Court of Boone County
The Honorable William S. Thompson, Judge
No. 14-A-04

REVERSED

_____

Submitted: September 4, 2019
Filed: November 18, 2019

Ancil G. Ramey, Esq.                          Lora Keyser Fugate, Esq.
Hannah C. Ramey, Esq.                         Harts, West Virginia
Steptoe & Johnson PLLC                        Counsel for Respondents
Huntington, West Virginia
Counsel for Petitioners


Matthew M. Hatfield, Esq.                     L. Scott Briscoe, Esq.
Hatfield & Hatfield, PLLC                     Danville, West Virginia
Madison, West Virginia                        Guardian ad litem
Counsel for Petitioners

CHIEF JUSTICE WALKER delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "'This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*.' Syl. Pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996)." Syllabus Point 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

2. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

3. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus Point 1, *Smith v. State Workmen's Comp. Com'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975).

4. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syllabus Point 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968).

3. "Statutes in pari materia must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect." Syllabus Point 3, *State ex rel. Graney v. Sims*, 144 W. Va. 72, 105 S.E.2d 886 (1958).

4. "'The Legislature, when it enacts legislation, is presumed to know its prior enactments.' Syllabus Point 12, *Vest v. Cobb*, 138 W.Va. 660, 76 S.E.2d 885 (1953)." Syllabus Point 5, *Pullano v. City of Bluefield*, 176 W. Va. 198, 342 S.E.2d 164 (1986).

5.      An "agreement" for purposes of West Virginia Code § 48-22-704(e) (2015) is a mutual manifestation of assent by the adoptive parent(s) and a third party as to visitation or communication with the adopted child that is either stated in full in the final adoption order or explicitly referenced in that order and made an exhibit to it.  All parties to the agreement must endorse the final adoption order and any agreement incorporated by reference.

WALKER, Chief Justice:

Petitioners Murrell and Linda B. adopted C.B. in 2014 when he was five years old.[1]  In 2012, Linda had been named C.B.'s guardian.  Prior to that, C.B. lived with Respondents Clarence and Nancy R., although they were not related to C.B. and they were not his legal guardians.  When Linda became C.B.'s guardian in 2012, the family court granted Clarence and Nancy visitation with C.B.  Murrell and Linda allowed that visitation to continue following the 2014 adoption until, in 2016, the parties quarreled, and Murrell and Linda drastically reduced the visitation.  Clarence and Nancy petitioned for visitation with C.B., which the circuit court granted, relying on Clarence and Nancy's pre-adoption relationship with C.B. and the child's best interests.

On appeal, we uphold Murrell and Linda's challenge to the circuit court's order granting visitation.  First, Clarence and Nancy did not have standing to petition the circuit court to modify their alleged post-adoption visitation agreement under West Virginia Code § 48-9-103 (2015).  And, applying the plain language of West Virginia Code § 48-22-703(a) (2015), we find that Murrell and Linda's adoption of C.B. in 2014 severed Clarence and Nancy's visitation with the child.  Further, because the 2014 Adoption Order does not provide for visitation between Clarence, Nancy, and C.B., we conclude that an agreement among the parties regarding post-adoption visitation does not exist in this case.

---

[1] Because of the sensitive nature of the facts alleged in this case, we use the parties' first names and initials and identify the child by his initials, only.  *See In re K.H.*, 235 W. Va. 254, 256 n.1, 773 S.E.2d 20, 22 n.1 (2015).

1

For these reasons, we reverse the circuit court's final order granting scheduled visitation with C.B. to Clarence and Nancy.

## I.    FACTS AND PROCEDURAL HISTORY

C.B. was born in August 2008 to S.A.-1.  Shortly after C.B.'s birth, the West Virginia Department of Health and Human Resources filed an abuse and neglect petition against S.A.-1, removed C.B. from S.A.-1's custody, and placed him with her sister, S.A.-2.  At the time, S.A.-2 lived with Clarence and Nancy, the parents of her then-husband. From the fall of 2008 until September 2012, C.B. lived with Clarence and Nancy.  They provided C.B. with economic and emotional support although they were not his blood relatives and never established a legal relationship to him.

In April 2009, the Circuit Court of Boone County (No. 08-JA-44) granted temporary guardianship of C.B. to S.A.-2.  It then dismissed the abuse and neglect petition pending against S.A.-1.  Later, in 2010, the Family Court of Logan County (No. 2009-FIG-11) appointed S.A.-2 as C.B.'s permanent guardian under Chapter 48 (formerly Chapter 44) of the West Virginia Code.

As the Boone County abuse and neglect case wound down, a March 2009 paternity test showed that S.B., Murrell and Linda's son, was C.B.'s biological father.  S.B. immediately petitioned the Circuit Court of Boone County (No. 09-D-145) to establish paternity of C.B. and to obtain custody and a parenting plan.  In September 2009, S.B. voluntarily dismissed that petition in favor of parallel proceedings in Logan County

2

(No. 2009-FIG-11; No. 2009-D-323). Through those proceedings, S.B. received parenting time with C.B., to be supervised by Murrell and Linda.[2] In the course of the ensuing visits, Murrell and Linda formed a relationship with C.B. They also formed a relationship with Clarence and Nancy, with whom C.B. continued to reside.

In April 2012, Linda petitioned the Family Court of Logan County (No. 09-FIG-11) to become C.B.'s permanent, legal guardian. Linda alleged that S.A.-2 had delegated her guardianship responsibilities to Clarence and Nancy, and that C.B.'s best interests required termination of S.A.-2's guardianship. Linda also acknowledged that C.B. had been in Clarence and Nancy's care since at least 2010 and that a "defacto [sic] parenting plan/guardian arrangement" existed between the couples. Linda's petition concluded,

> WHEREFORE, [Murrell and Linda] maintain that the best interest of the child is placing them as legal guardians over the person and estate of [C.B.], alternatively allowing [Clarence and Nancy] provide [sic] the responsibilities as guardians for said child, and for such other and further relief as the Court is duty bound to so grant and they shall forever pray.

Clarence and Nancy did not intervene in or otherwise object to Linda's petition for guardianship.

---

[2] According to a petition for modification of the visitation order filed by S.A.-2, the Family Court of Logan County ordered supervised visitation because it found that S.B.'s prior drug abuse, felony criminal convictions, probation violations, and disinterest in drug abuse treatment rendered him unfit to provide custodial care to C.B.

3

The family court granted Linda's petition on September 6, 2012 (2012 Guardianship Order). The 2012 Guardianship Order provided that "visitation between [Clarence and Nancy], continue to be exercised as the parties address and resolve as represented in open Court." The appendix record does not contain a transcript of the hearing on Linda's guardianship petition.

On April 1, 2014, Murrell and Linda filed a petition to adopt C.B. in the Circuit Court of Boone County (No. 14-A-4). The court set a hearing on the petition for the following June; appointed a guardian ad litem for S.B., who was then incarcerated; and ordered the clerk to notify Clarence and Nancy of the adoption petition based upon their visitation rights with C.B. under the 2012 Guardianship Order.[3]

The circuit court held a hearing on the adoption petition on June 2, 2014. Clarence and Nancy attended the hearing, but they were not represented by counsel. The circuit court asked them several times if they objected to the adoption, and each time they indicated that they did not. As to visitation, the court questioned Nancy as follows:

> Circuit court: And I'm assuming [Clarence and Nancy], you all are okay with the adoption going forward?
>
> Nancy:      Yes, we just want visitation –
>
> Circuit court: Visitation to remain the same?
>
> Nancy:      Yes, Your Honor.

---

[3] *See* W. Va. Code § 48-22-601(a)(3) (2015).

> Circuit court:     All right.  [Murrell and Linda's counsel], do you have me an order?

> Murrell and Linda's counsel:     I do, Judge. . . .

On June 2, 2014, the circuit court entered the final order granting Murrell and Linda's petition to adopt C.B. (2014 Adoption Order).[4]  In that order, the circuit court found:  (1) Clarence and Nancy exercised visitation with C.B.; (2) they were provided notice[5] of the hearing; (3) that they did not object to the adoption, and, in fact advised the court that adoption served C.B.'s best interests; and (4) the adoption was in C.B.'s best

---

[4] In the 2014 Adoption Order, the circuit court also found that S.B. consented to the adoption, *see* West Virginia Code § 48-22-303, and that S.A.-1's failure to communicate with C.B. or to provide him any type of support constituted abandonment under West Virginia Code § 48-22-306.

[5] *See* West Virginia Code §§ 48-22-601 and 602 (2015).  Section 48-22-602(b) specifies that this notice must

> inform the person, in plain language, that his or her parental rights, if any, may be terminated in the proceeding and that such person may appear and defend any such rights within the required time after such service. The notice shall also provide that if the person upon whom notice is properly served fails to respond within the required time after its service, said person may not appear in or receive further notice of the adoption proceedings.

Clarence and Nancy appeared at the June 2014 hearing.  They did not contest the final adoption on the grounds that they did not receive notice or that the notice was improper.  *See* West Virginia Code § 48-22-704(c) (2015) (individual may challenge order of adoption if challenge is brought within six months after order becomes final, individual did not receive proper notice of the adoption proceedings, and individual proves by clear and convincing evidence that the order is not in the best interests of the child).

5

interests. The order of adoption did not specify that visitation between Clarence, Nancy, and C.B. would continue, post-adoption. No one challenged the adoption order under West Virginia Code § 48-22-704, and it became final in July 2014.[6]

After the adoption, Murrell and Linda permitted Clarence and Nancy to visit with C.B. Clarence and Nancy assert that, at first, the frequency and duration of their time with C.B. mirrored what Murrell and Linda had allowed under the 2012 Guardianship Order, which was approximately two to three weekends per month. This pattern changed in August 2016,[7] when a dispute arose between the parties regarding a birthday gift from Clarence and Nancy to C.B. According to Nancy, between August 2016 and April 2017, Murrell and Linda permitted Clarence and Nancy to see C.B. approximately five times under supervision.

In October 2016, Clarence and Nancy, now represented by counsel, filed a "Petition for Modification of Visitation" in the closed Boone County adoption case asking the circuit court to enter an order setting a visitation schedule (Petition for Modification). Clarence and Nancy alleged that they consented to Linda's guardianship of C.B. in 2012

---

[6] Records of proceedings in adoption cases are not open for inspection, generally. They may be opened for inspection pursuant to a court order for good cause shown. *See* W. Va. Code § 48-22-702(a) (2015). Clarence and Nancy did not petition the circuit court to permit them to inspect the adoption order.

[7] Nancy also testified that visits decreased once C.B.'s adoptive brother (and biological father), S.B., returned to his parents' home following his release from incarceration.

6

"with the agreement that they would continue visiting with [C.B.] on a regular basis." As to the nature of that visitation, Clarence and Nancy alleged that the "Logan County Family Court was in agreement with the modification [i.e., appointment of Linda as guardian to C.B.] and was going to schedule visitation, but both parties agreed that they could work together in the BEST INTEREST [sic] of [C.B.]." Clarence and Nancy alleged that "the visitation was continuing regularly and uninterrupted until recently," when Murrell and Linda unilaterally ended visitation. Clarence and Nancy also alleged that they appeared at the 2014 adoption hearing to protect their interest and

> to make sure they were able to continue to see [C.B.] and [Murrell and Linda] stated that was correct, so [Clarence and Nancy] did not object to said adoption. Since said adoption, visitation has continued uninterrupted until approximately two months ago, as agreed upon; so, due to [Murrell and Linda] continuing to follow the visitation schedule [Clarence and Nancy] believe that this Court granted visitation at said adoption hearing.

In February 2017, the circuit court appointed a guardian ad litem for C.B. The guardian was to interview C.B. and the parties, then make a recommendation to the circuit court regarding Clarence and Nancy's petition. After observing C.B. interacting with Clarence and Nancy in a public park and a restaurant, the guardian reported to the court that C.B. shared a bond with them. The guardian did not consult a psychologist regarding the impact upon C.B. of discontinuing visitation with Clarence and Nancy, nor did he ask the court to interview C.B., in camera, as to the child's wishes or view of his

7

own best interests.  The guardian did not interview Murrell and Linda regarding their preference as to visitation between Clarence, Nancy, and C.B.

In response to the Petition for Modification, Murrell and Linda emphasized that Clarence and Nancy were not C.B.'s grandparents.  They also argued that the 2014 Adoption Order extinguished any visitation that Clarence and Nancy had with C.B. under the 2012 Guardianship Order.  Murrell and Linda further asserted that the 2014 Adoption Order did not include post-adoption visitation for Clarence and Nancy, and that, regardless, West Virginia Code § 48-22-802 (2015)[8] precluded such an arrangement.

Later, the guardian moved the circuit court to declare that Clarence and Nancy were the "psychological parents" of C.B., and to direct Murrell and Linda to continue to include Clarence and Nancy in C.B.'s life.  The same day, Clarence and Nancy replied in support of the Petition for Modification, also moving for a declaration that they

---

[8] Section 48-22-802 states,

> Any contract, agreement or stipulation which endeavors to deny to any person or persons the right to petition for adoption of any person, or which endeavors to alter the time or manner of adoption as provided in this article, is contrary to the public policy of the state and such portion of any contract, agreement or stipulation is null and void and of no effect.

were C.B.'s psychological parents. Citing this Court's decision in *In re K.H.*,[9] Clarence and Nancy reiterated their request for scheduled visitation.

The circuit court held two evidentiary hearings in April 2017 on the issue of whether Clarence and Nancy were C.B.'s psychological parents. Clarence and Nancy testified, and while Murrell and Linda's attorney was permitted to cross-examine them, the circuit court did not permit Murrell and Linda to testify or to present evidence before directing the parties to submit proposed orders resolving Clarence and Nancy's Petition for Modification.

The parties submitted their proposed orders later in January 2018. Murrell and Linda's proposed order included lengthy findings of fact and conclusions of law, while the proposals by the guardian and by Clarence and Nancy included detailed visitation schedules. Following the guardian's proposed order closely, the circuit court granted Clarence and Nancy's Petition for Modification and set a liberal visitation schedule between them and C.B. (2018 Visitation Order). The court based the grant of visitation to Clarence and Nancy on two findings: that Clarence and Nancy were C.B.'s psychological parents and that scheduled visitation between Clarence, Nancy, and C.B. was in C.B.'s best interests.

---

[9] 235 W. Va. at 266, 773 S.E.2d at 32 (affirming circuit court's termination of biological grandmother's guardianship of K.H. and also finding that K.H. was entitled to continued association with her grandmother and remanding for entry of order setting a visitation schedule).

9

In the 2018 Visitation Order, entered January 16, 2018, the court granted Clarence and Nancy something they had not enjoyed before—a schedule of visitation with C.B. Under that schedule, C.B. was to visit Clarence and Nancy one Monday evening and one Friday evening per month during the school year, plus one overnight, weekend stay each month. During the summer, C.B. was to spend one week in both June and July with Clarence and Nancy. As for holidays, C.B. was to stay with Clarence and Nancy (1) from the beginning of his school's holiday break until 8:00 p.m. on Christmas Eve; (2) the entire Martin Luther King, Jr. three-day holiday weekend; (3) one-half of the week of Easter break; and (4) from the beginning of his school's Thanksgiving break until 5:00 p.m. on the Wednesday of the holiday week.[10] Murrell and Linda now appeal the 2018 Visitation Order.[11]

## II. STANDARD OF REVIEW

"'This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*' Syl. Pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996)."[12] "Where the issue on an appeal

---

[10] The visitation schedule also provided for telephone calls between C.B., Clarence, and Nancy on Tuesday and Sunday evenings.

[11] On May 22, 2018, Murrell and Linda moved this Court to stay the 2018 Visitation Order pending this appeal. This Court granted that motion on June 5, 2018.

[12] Syl. Pt. 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."[13]

### III. THE PARTIES' ARGUMENTS

Murrell and Linda raise four assignments of error. First, they contend that Clarence and Nancy do not have standing under West Virginia Code § 48-9-103 (2015) to intervene in the closed adoption case. Second, they assert that the 2018 Visitation Order violates West Virginia Code § 48-22-703(a) (2015), which provides for the finality of adoption orders.[14] Third, they allege that the evidence before the circuit court did not

---

[13] Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

[14] West Virginia Code § 48-22-703(a) (2015) states:

> Upon the entry of such order of adoption, any person previously entitled to parental rights, any parent or parents by any previous legal adoption, and the lineal or collateral kindred of any such person, parent or parents, except any such person or parent who is the husband or wife of the petitioner for adoption, shall be divested of all legal rights, including the right of inheritance from or through the adopted child under the statutes of descent and distribution of this state, and shall be divested of all obligations in respect to the said adopted child, and the said adopted child shall be free from all legal obligations, including obedience and maintenance, in respect to any such person, parent or parents. From and after the entry of such order of adoption, the adopted child shall be, to all intents and for all purposes, the legitimate issue of the person or persons so adopting him or her and shall be entitled to all the rights and privileges and subject to all the obligations of a natural child of such adopting parent or parents.

support its finding that Clarence and Nancy were C.B.'s psychological parents under the criteria announced by this Court in Syllabus Point 3 of *In re Clifford K*.[15]  Finally, Murrell and Linda claim that the 2018 Visitation Order interferes with their constitutional right to raise their adopted son, C.B., unfettered, in the absence of allegations that they are unfit.[16]  Murrell and Linda also challenge the circuit court's failure to provide them an opportunity to testify or present evidence before entering the 2018 Visitation Order, an omission that they contend violated their right to procedural due process.

Clarence and Nancy respond that West Virginia Code § 48-9-103(a)(3) (2015) enables persons "who were parties to a prior order establishing custody or visitation" to participate in a custody action, a condition satisfied by the 2012 Guardianship Order.  Clarence and Nancy also argue that their testimony supports the court's finding that they were C.B.'s psychological parents.  Relying on our decision in *In re K.H.*,[17] they argue that the circuit court correctly found that scheduled visitation serves C.B.'s best interests.

The guardian responds in support of the 2018 Visitation Order, arguing that it serves C.B.'s best interests and his right to continued association.  As to standing, the guardian argues that Clarence and Nancy did not intervene in the Boone County adoption action, but were parties to it by virtue of the notice afforded them under West Virginia

---

[15] Syl. Pt. 3, *In re Clifford K.*, 217 W. Va. 625, 619 S.E.2d 138 (2005).  Syllabus Point 3 is quoted in full, below.

[16] *See Troxel v. Granville*, 530 U.S. 57 (2000).

[17] 235 W. Va. at 254, 773 S.E.2d at 20.

Code § 48-22-601 and by the actions of Murrell and Linda and the circuit court during the June 2014 adoption hearing. He also argues that Clarence and Nancy had standing to pursue post-adoption visitation under § 48-9-103(b) because they are C.B.'s psychological parents.[18]

## IV. DISCUSSION

We begin by reviewing the procedural posture of this case. Clarence and Nancy did not seek custody of Murrell and Linda's child, C.B., in their Petition for Modification. Instead, Clarence and Nancy asked the circuit court to enforce an agreement they allegedly formed with Murrell and Linda to allow them to visit C.B. following the 2014 adoption. The parties, the guardian ad litem, and the circuit court considered this dispute in the context of the psychological parent doctrine and West Virginia Code § 48-9-103. For the reasons discussed below, we view the particular facts and circumstances of this appeal through the lens of West Virginia Code § 48-22-703(a) (2015), providing for the finality of adoption orders, and West Virginia Code § 48-22-704(e) (2015), permitting—in limited circumstances—a circuit court to hear a petition to enforce an agreement to visit or communicate with an adopted child.

---

[18] Neither Clarence and Nancy nor the guardian responded to Murrell and Linda's argument that the circuit court's order violates West Virginia Code § 48-22-703(a).

13

*A.* *West Virginia Code § 48-9-103 Does Not Apply to Clarence and Nancy's Petition for Modification.*

Before the circuit court and now on appeal, a large portion of the parties' arguments focus on the question of whether Clarence and Nancy are "entitled to an adjudication *of the particular claims asserted.*"[19] That is, whether they had standing to seek a court ruling on their Petition for Modification.

The parties try to answer this question with the psychological parent doctrine and § 48-9-103.[20] We defined the psychological parent concept and specified the

---

[19] *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 95, 576 S.E.2d 807, 22 (2002) (emphasis in original) (quoting *Int'l Primate Protect. Lge. v. Admin. of Tulane Ed. Fund*, 500 U.S. 72, 77 (1991)).

[20] This statute states:

> (a) Persons who have a right to be notified of and participate as a party in an action [regarding custody of a child] filed by another are:
>
> (1) A legal parent of the child, as defined in [§ 48-1-232] of this chapter;
>
> (2) An adult allocated custodial responsibility or decision-making responsibility under a parenting plan regarding the child that is then in effect; or
>
> (3) Persons who were parties to a prior order establishing custody and visitation, or who, under a parenting plan, were allocated custodial responsibility or decision-making responsibility.
>
> (b) In exceptional cases the court may, in its discretion, grant permission to intervene to other persons or public agencies whose participation in the

14

circumstances in which a psychological parent may intervene in a custody proceeding in *In re Clifford K.*[21]  In that case, infant Z.B.S. became the subject of a custody dispute following the death of his biological mother.[22]  Tina B., the partner of Z.B.S.'s biological mother, sought to intervene in the custody dispute as Z.B.S.'s psychological parent.[23]  The circuit court found that Tina B. did not satisfy the requirements of § 48-9-103 and so found that she lacked standing to intervene in the ongoing custody dispute.[24]  We reversed the circuit court and held that "[i]n exceptional cases and subject to the court's discretion, a psychological parent may intervene in a custody proceeding brought pursuant to W. Va.Code § 48–9–103 (2001) (Repl.Vol.2004) when such intervention is likely to serve the best interests of the child(ren) whose custody is under adjudication."[25]  We then found

---

proceedings under this article it determines is likely to serve the child's best interests. The court may place limitations on participation by the intervening party as the court determines to be appropriate. Such persons or public agencies do not have standing to initiate an action under this article.

[21] 217 W. Va. at 625, 619 S.E.2d at 138.

[22] *Id*. at 631, 619 S.E.2d at 144.

[23] *Id*.

[24] *Id*. at 631–32, 619 S.E.2d at 144–45.

[25] Syl. Pt. 4, *id*., 217 W. Va. at 625, 619 S.E.2d at 138.

that Tina B. and Z.B.S.'s case was exceptional and that Tina B. more than satisfied the criteria we simultaneously announced to define the psychological parent relationship.[26]

Syllabus Point 3 of *In re Clifford K.* is quite clear:  a putative psychological parent may intervene in a "custody proceeding brought pursuant to W. Va.Code § 48–9–103 (2001) (Repl.Vol.2004) when such intervention is likely to serve the best interests of the child(ren) whose custody is under adjudication."[27]  That statute, § 48-9-103, specifies who may be a party to, and who may intervene in, *a custody action* under West Virginia Code Chapter 48, Article 9, which "sets forth principles governing the allocation of custodial and decision-making responsibility for a minor child when the parents do not live together."[28]

In this case, Clarence and Nancy filed their Petition for Modification in the closed, Boone County adoption case, a proceeding subject to West Virginia Code Chapter 48, Article 22, Adoption.  They did not allege in that petition that C.B.'s adoptive parents,

---

[26] *See* Syl. Pt. 3, *id.* ("A psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), that case is expressly modified.").

[27] Syl. Pt. 4, *id.*

[28] W. Va. Code § 48-9-101(a) (2015).

16

Murrell and Linda, no longer live together, or that C.B. is otherwise the subject of a pending custody action. They did not ask the court for custody of C.B. Instead, they alleged that following the 2014 adoption, Murrell and Linda decreased their visitation with C.B. and asked the circuit court to impose a schedule of visitation so that would not happen again. These circumstances are quite different than those in *In re Clifford K.* and the cases in which we have previously relied on the psychological parent doctrine to award visitation.[29] So, given the relief sought by Clarence and Nancy, the absence of a pending custody action, and Clarence and Nancy's decision to file their Petition for Modification in the closed, Boone County adoption case, the psychological parent doctrine and § 48-9-103 cannot confer standing upon them to petition for visitation with C.B.

**B.     Post-Adoption Visitation under West Virginia Code §§ 48-22-703 and 48-22-704.**

Clarence and Nancy's Petition for Modification triggers other portions of Chapter 48—sections 703(a) and 704(e) of Article 22, Adoption. The former statute provides for the finality of adoptions. The latter enables a circuit court to hear a petition to enforce an agreement for visitation or communication with an adopted child, and so provides Clarence and Nancy the standing they lack under § 48-9-103. We apply our

---

[29] *See, e.g.*, *In re K.H.*, 235 W. Va. at 266, 773 S.E.2d at 32 (granting custody of K.H. to her biological father but awarding visitation to grandmother based on finding that she was K.H.'s psychological parent); *In re Visitation & Custody of Senturi N.S.V.*, 221 W. Va. 159, 167–68, 652 S.E.2d 490, 498–99 (2007) (finding that members of infant Senturi's extended family were not his "psychological parents" in the context of a custody dispute between the child's biological parents.).

17

principles of statutory construction to these provisions and then apply them to the facts and circumstances of this case.

"The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature."[30] Ordinarily, the language of the statute reflects the intent of the Legislature so the words of the statute are given their common usage.[31] That is why "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation."[32]

"On the other hand, when the statutory language is not clear, it must be construed" before it can be applied.[33] Statutory language may be unclear because the Legislature has not defined a statutory term; if that is the case, then the undefined terms "will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used."[34]

---

[30] Syl. Pt. 1, *Smith v. State Workmen's Comp. Com'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975).

[31] *State ex rel. Frazier v. Meadows*, 193 W. Va. 20, 23–24, 454 S.E.2d 65, 68–69 (1994) (collecting cases).

[32] Syl. Pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968).

[33] *State ex rel. Morrisey v. W. Va. Off. of Disciplinary Counsel*, 234 W. Va. 238, 248, 764 S.E.2d 769, 779 (2014).

[34] *In re Clifford K.*, 217 W. Va. at 633, 619 S.E.2d at 146 (quoting Syl. Pt. 1, *Miners in Gen. Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982)).

Statutory language may also be unclear—and, therefore, open to construction—because it is ambiguous, meaning that it is "susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning."[35] In those circumstances, "'a court often must venture into extratextual territory in order to distill an appropriate construction. Absent explicatory legislative history for an ambiguous statute . . . this Court is obligated to consider the . . . overarching design of the statute.'"[36] Consequently, "[s]tatutes in pari materia must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect."[37] We now consider §§ 48-22-703(a) and 48-22-704(e) in view of these rules to determine whether Clarence, Nancy, Linda, and Murrell formed an agreement as to post-adoption visitation with C.B., as that term is used in § 48-22-704(e).

### 1. *West Virginia Code § 48-22-703.*

Section 48-22-703(a) states:

> [u]pon the entry of such order of adoption, any person previously entitled to parental rights, any parent or parents by any previous legal adoption, and the lineal or collateral kindred of any such person, parent or parents, except any such person or parent who is the husband or wife of the petitioner for adoption, shall be

---

[35] *Crockett v. Andrews*, 153 W. Va. 714, 718, 172 S.E.2d 384, 386 (1970).

[36] *State v. Fuller*, 239 W. Va. 203, 208, 800 S.E.2d 241, 246 (2017) (quoting *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995)).

[37] Syl. Pt. 3, *State ex rel. Graney v. Sims*, 144 W. Va. 72, 105 S.E.2d 886 (1958).

19

divested of all legal rights, including the right of inheritance from or through the adopted child under the statutes of descent and distribution of this state, and shall be divested of all obligations in respect to the said adopted child, and the said adopted child shall be free from all legal obligations, including obedience and maintenance, in respect to any such person, parent or parents. From and after the entry of such order of adoption, the adopted child shall be, to all intents and for all purposes, the legitimate issue of the person or persons so adopting him or her and shall be entitled to all the rights and privileges and subject to all the obligations of a natural child of such adopting parent or parents.

Under § 48-22-703(a), "any person previously entitled to parental rights . . . shall be divested of all legal rights . . . and shall be divested of all obligations in respect to the said adopted child" once the order of adoption becomes final.[38] Likewise, the child is also "free[d] from all legal obligations, including obedience and maintenance, in respect to any such person, parent or parents."[39] The child becomes, for all intents and purposes, "the

---

[38] "Except, of course, in the case of stepparent adoption wherein the spouse of the stepparent, who is also the child's biological or adoptive parent, retains his/her relationship with the child as do the parents of that parent." *Visitation of Cathy L.(R.)M. v. Mark Brent R.*, 217 W. Va. 319, 328 n.1, 617 S.E.2d 866, 875 n.1 (2005) (Davis, J., concurring) (citing § 48-22-703(a) (stating that, "'[u]pon the entry of such order of adoption, any person previously entitled to parental rights, any parent or parents by any previous legal adoption, and the lineal or collateral kindred of any such person, parent or parents, *except any such person or parent who is the husband or wife of the petitioner for adoption,* shall be divested of all legal rights . . .' (emphasis added)")). *See also* W. Va. Code § 48-10-902 (2015) ("If a child who is subject to a grandparent visitation order under this article is later adopted, the order for grandparent visitation is automatically vacated when the order for adoption is entered, unless the adopting parent is a stepparent, grandparent or other relative of the child.").

[39] W. Va. Code § 48-22-703(a).

legitimate issue of the person or persons so adopting him" and is "entitled to all the rights and privileges and subject to all the obligations of a natural child of such adopting parent or parents."[40]

The language of § 48-22-703(a) is clear and unambiguous. It demonstrates the Legislature's intent that

> once the proceedings surrounding an adoption have been concluded, the ultimate import of the court's final order of adoption is just that——to serve as a final and complete resolution of the adoptee's former and forthcoming familial and legal relationships, thereby providing him/her with the comfort and knowledge of future certainty.[41]

Because § 48-22-703(a) is clear and unambiguous, we apply it to the case before us without construing it. The circuit court entered the 2014 Adoption Order on June 2, 2014, and it became final thirty days later on July 2, 2014.[42] As of that date, Clarence

---

[40] *Id.*

[41] *State ex rel. Brandon L. v. Moats*, 209 W. Va. 752, 767, 551 S.E.2d 674, 689 (2001) (Davis, J. dissenting). *See also Visitation of Cathy L.(R.)M.*, 217 W. Va. at 328, 617 S.E.2d at 875 ("[T]he central aim of adoption is finality, finality in the severance of pre-existing relationships and finality in the creation of new adoptive relationships, which breeds certainty for adopted children and their adoptive parents, alike, in their new adoptive relationship.") (Davis, J., concurring).

[42] *See* W. Va. Code § 48-22-704(a) ("An order or decree of adoption is a final order for purposes of appeal to the Supreme Court of Appeals on the date when the order is entered. An order or decree of adoption for any other purpose is final upon the expiration of the time for filing an appeal when no appeal is filed or when an appeal is not timely filed, or upon the date of the denial or dismissal of any appeal which has been timely filed."). The 2014 Adoption Order was not appealed, so it became final thirty days after

21

and Nancy were divested of any visitation with C.B. they may have had prior to the adoption. Clarence and Nancy offer no reason why this is not so, and we do not see one. The 2014 Adoption Order does not state that visitation between Clarence, Nancy, and C.B. was to continue after the adoption. To the extent the 2012 Guardianship Order granted Clarence and Nancy visitation with C.B., entry of the 2014 Adoption Order ended it. And, while Clarence and Nancy may have formed a psychological parent relationship with C.B. prior to 2014, they cannot rely on that pre-adoption relationship to establish visitation with him post-adoption.[43] Therefore, we find that, as a matter of law, the final 2014 Adoption Order severed any visitation that Clarence and Nancy may have had with C.B. prior to his adoption in 2014.

---

the order was entered. *See W. Va. R. App. Pro.* 5(b) (notice of appeal must be docketed within thirty days of entry of the judgment).

[43] Clarence and Nancy argue that the circuit court's oral statements about visitation during the 2014 adoption hearing support their argument that the pre-adoption visitation with C.B. survived entry of the 2014 Adoption Order. But, the order of adoption is prime, and the circuit court's oral statements, uttered before entry of the 2014 Order of Adoption, cannot add to or subtract from the final effect of that order. Second, and more generally, a court speaks through its orders. *See Harvey v. Harvey*, 171 W. Va. 237, 241, 298 S.E.2d 467, 471 (1982) ("That a court of record speaks only through its records or orders has been generally affirmed by this Court in subsequent cases."). If there is a conflict between the circuit court's oral statements during the June 2014 hearing and the 2014 Adoption Order, the Adoption Order controls. *See Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 107 n.5, 459 S.E.2d 374, 383–84 n.5 (1995) (noting that "it is clear that where a circuit court's written order conflicts with its oral statement, the written order controls.").

22

## 2. *West Virginia Code § 48-22-704(e).*

Clarence and Nancy alleged in their Petition for Modification that after the 2014 adoption, "visitation [with C.B.] continued uninterrupted until approximately two months ago, as agreed upon . . . ." That allegation—combined with Clarence and Nancy's testimony that Murrell and Linda promised to keep them in C.B.'s life—triggers West Virginia Code § 48-22-704 (2015).

In § 48-22-704(a) to (d), the Legislature specified the limited circumstances in which a final adoption order may be vacated or set aside. Similarly, in subsection (e), the Legislature stated that an adoption order may not be vacated or set aside if a person alleges that there is a failure to comply with an agreement for visitation or communication with the adopted child. The Legislature did, however, include a proviso in subsection (e) in which it granted limited authority to courts to

> hear a petition to enforce the agreement [for visitation or communication with the adopted child], in which case the court shall determine whether enforcement of the agreement would serve the best interests of the child. The court may, in its sole discretion, consider the position of a child of the age and maturity to express such position to the court.[44]

Section 48-22-704(e) demonstrates the Legislature's intent to enable a circuit court to hear a petition to enforce an agreement for visitation or communication with an adopted child—that much is plain. But, while the Legislature clearly enabled a circuit

---

[44] W. Va. Code § 48-22-704(e).

court to hear a petition like Clarence and Nancy's, it did not define the term "agreement" or specify how one could be formed under § 48-22-704(e).  To fill this gap, we look to the term's "common, ordinary and accepted meaning in the connection in which [it is] used."[45]

Dictionaries define the term "agreement" as (1) "harmony of opinion, action, or character[,]"[46] (2) "harmony or accordance in opinion or feeling[,]"[47] and (3) "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."[48]  As explained in a leading treatise:

> An agreement, as the courts have said, "is nothing more than a manifestation of mutual assent" by two or more parties legally competent persons to one another. Agreement is in some respects a broader term than contract, or even than bargain or promise. It covers executed sales, gifts, and other transfers of property.[49]

The term "agreement" appears in other articles of West Virginia Code, Chapter 48.  For example, a "separation agreement," defined in West Virginia Code

---

[45] *In re Clifford K.*, 217 W. Va. at 633, 619 S.E.2d at 146 (quotation omitted).

[46] *Merriam-Webster's Collegiate Dictionary* 26 (11th ed. 2005).

[47] *New Oxford American Dictionary* 32 (3d. ed. 2001).

[48] AGREEMENT, Black's Law Dictionary (10th ed. 2014).

[49] *Id*. (quoting 1 Samuel Williston, *A Treatise on the Law of Contracts* § 2, at 6 (Walter H.E. Jaeger ed., 3d ed. 1957)).  *See also Bailey v. Sewell Coal Co.*, 190 W. Va. 138, 140, 437 S.E.2d 448, 450 (1993) ("'It is elementary that mutuality of assent is an essential element of all contracts.'") (quoting *Wheeling Downs Racing Ass'n v. W. Va. Sportservice, Inc.,* 158 W.Va. 935, 216 S.E.2d 234 (1975)).

§ 48-6-101(a) (2015), is a "written agreement between a husband and wife whereby they agree to live separate and apart from each other." West Virginia Code § 48-31-201 (2019 Supp.) specifies the form of an agreement addressing custodial responsibility during a military deployment. Under that statute, parents may enter into a temporary agreement granting custodial responsibility for a child during a military deployment, but the agreement must be in writing and signed by both parents and any nonparent to whom custodial responsibility is granted.[50] And, in West Virginia Code § 48-9-201 (2015), the Legislature stated that if parents have agreed to one or more provisions of a parenting plan, the court "shall so order," unless it determines that the parents' agreement is not knowing or voluntary or their agreed plan would harm the child.

As of 2012, West Virginia, approximately twenty-five other states, and the District of Columbia "had enacted laws providing for some form of enforceable agreement between birth parents and adoptive parents."[51] While the laws of each state differ, one academic has distilled from the various statutes two general "requirements that must be met for a court to recognize a post adoption agreement. First, the agreement needs to be in

_____

[50] W. Va. Code § 48-31-201(a), (b) (2019 Supp.).

[51] Carol Sanger, *Bargaining for Motherhood: Postadoption Visitation Agreements*, 41 Hofstra L. Rev. 309, 319 (2012). According to the Child Welfare Information Gateway, an initiative of the Children's Bureau, U.S. Department of Health and Human Services, as of 2019, 29 states have statutes that allow written and enforceable agreements for contact after finalization of an adoption. *See* Child Welfare Info. Gateway, *Postadoption contact agreements between birth and adoptive families* 2 (2019), available at https://www.childwelfare.gov/pubpdfs/cooperative.pdf.

writing and signed by each party. Second, the court must approve the terms of the agreement."[52] Additional secondary sources describe agreements in the context of post-adoption visitation similarly.[53]

We discern the following commonalities among these sources. First, that an agreement is the result of mutual assent. Second, that in the context of Chapter 48 of the West Virginia Code, the agreements referenced above are written and may, in the case of a parenting agreement, be made part of a court order. Third, in the particular context of post-adoption visitation agreements, agreements are generally made in writing, signed by each party, and approved by the court.

We consider an additional source to define an "agreement" for purposes of § 48-22-704(e). That is § 48-22-703(a), and the legislature's clear instruction in that statute that the final adoption order is the mechanism that both severs old family relationships and

---

[52] Leigh Gaddie, *Open Adoption*, 22 J. Am. Acad. Matrim. Law. 499, 503 (2009) (notes omitted).

[53] *Sanger*, 41 Hofstra L. Rev. at 319 ("While the statutes differ in interesting ways, each provides that postadoption visitation agreements are legal so long as the agreement is in writing and approved by the court, most often by being incorporated into the final order of adoption."). *See also* Margaret C. Jasper, *The Law of Adoption* 51 (2011) ("A post-adoption contact agreement—also referred to as an 'open adoption agreement'—is a court-approved contract that permits some degree of continuing contact or communication between the child's adoptive family and the child's birth family after the adoption is finalized.").

creates new ones. Because both §§ 48-22-703 and 704 pertain to the finality of adoptions, and the narrow statutory exceptions to that rule, we consider the statutes together.[54]

The earliest iteration of § 48-22-703(a) appeared in Chapter CXXII, § 4 of the West Virginia Code of 1884.[55] The statute was re-enacted in 1925[56] and has remained largely unchanged, since.[57] The Legislature added the language now found in § 48-22-704(e) to the Code in 1997—approximately seventy years after the last, major substantive amendment to § 48-22-703(a).[58]

"'The Legislature, when it enacts legislation, is presumed to know its prior enactments.'"[59] Therefore, we must assume that the Legislature was aware of the effect of a final adoption order under § 48-22-703(a) when it enacted § 48-22-704(e). As was stated in *State ex rel. Brandon L. v. Moats* with regard to § 48-22-703(a), "the ultimate import of

---

[54] Syl. Pt. 3, *State ex rel. Graney*, 144 W. Va. at 72, 105 S.E.2d at 886 ("[s]tatutes in pari materia must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect.").

[55] *See* 1882 W. Va. Acts Ch. 132.

[56] *See* 1925 W. Va. Acts. Ch. 74.

[57] The Legislature recodified Chapter 48 in 2001. 2001 W. Va. Acts Ch. 91. Prior to 2001, this statute was found at West Virginia Code § 48-4-11.

[58] 1997 W. Va. Acts Ch. 2. West Virginia Code § 48-4-12, the statute amended by the Legislature in 1997, was recodified as § 48-22-704(e) in 2001. 2001 W. Va. Acts Ch. 91.

[59] Syl. Pt. 5, *Pullano v. City of Bluefield*, 176 W. Va. 198, 342 S.E.2d 164 (1986) (quoting Syl. Pt. 12, *Vest v. Cobb,* 138 W.Va. 660, 76 S.E.2d 885 (1953)).

27

the court's final order of adoption is . . . to serve as a final and complete resolution of the adoptee's former and forthcoming familial and legal relationships, thereby providing him/her with the comfort and knowledge of future certainty."[60]  It is evident that an agreement contemplated by § 48-22-704(e) affects an adoptee's forthcoming familial and legal relationships, so we conclude that the agreement must be made a part of a final order of adoption.

Based on the foregoing analysis, we now hold that an "agreement" for purposes of West Virginia Code § 48-22-704(e) (2015) is a manifestation of mutual assent between an adoptive parent(s) and a third party as to visitation or communication with an adopted child that is either stated in full in the final adoption order or explicitly referenced in that order and made an exhibit to it.  All parties to the agreement must endorse the final adoption order and any agreement incorporated by reference.  This holding comports with the common usage of the term "agreement" as well as its usage in § 48-22-704(e).  It also safeguards the adoptive parent's right to the custody and control of his adopted child—a right that is equal to that of a biological parent and child.[61]

---

[60] *State ex rel. Brandon L.*, 209 W. Va. at 767, 551 S.E.2d at 689 (Davis, J., dissenting).  *See also Visitation of Cathy L.(R.)M.*, 217 W. Va. at 328, 617 S.E.2d at 875 (Davis, J., concurring) ("the central aim of adoption is finality, finality in the severance of pre-existing relationships and finality in the creation of new adoptive relationships, which breeds certainty for adopted children and their adoptive parents, alike, in their new adoptive relationship").

[61] Syl. Pt. 1, *In Re: Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973) ("In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other

Applying our holding to the facts and circumstances of this case, we find that the circuit court's 2018 Visitation Order is erroneous as a matter of law. As discussed above, the 2014 Adoption Order severed any pre-adoption visitation with C.B. that Clarence and Nancy may have had under either the psychological parent doctrine (predicated on pre-adoption conduct) or the 2012 Guardianship Order. Following the 2014 adoption, Clarence and Nancy were left to pursue visitation with C.B. under § 48-22-704(e).

The 2014 Adoption Order does acknowledge that Clarence and Nancy exercised visitation with C.B. during Linda's guardianship, but it does not state that the parties mutually agreed to continue visitation after the order of adoption became final. There is no dispute that Clarence and Nancy were provided notice of the adoption hearing and that they did not appeal the 2014 Adoption Order. Admittedly, they were not represented by counsel at either the 2012 guardianship hearing or the 2014 adoption hearing. Nevertheless, they were not prevented from obtaining counsel and that fact alone does not permit us to overlook the absence of any language in the 2014 Adoption Order

person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.").

For that same reason, we decline to address the guardian's argument that C.B.'s best interests, alone, justify the circuit court's 2018 Visitation Order. *See Visitation of Cathy L.(R.)M.*, 217 W. Va. at 327–28, 617 S.E.2d at 874–75 ("a judicial determination regarding whether grandparent visitation rights are appropriate may not be premised solely on the best interests of the child analysis. It must also consider and give significant weight to the parents' preference, thus precluding a court from intervening in a fit parent's decision making on a best interests basis.") (citing *Troxel*, 530 U.S. at 69).

29

reflecting a mutual understanding between Clarence, Nancy, Murrell, and Linda that Clarence and Nancy's visitation with C.B. would continue following the adoption.

## V. CONCLUSION

For the reasons explained above, we reverse the Circuit Court of Boone County's January 16, 2018 Final Order Finding the Petitioners to be Psychological Parents and Setting Visitation Schedule.

Reversed.