**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **Adoption of L.A.**

**No. 21-0372** (Hampshire County 20-A-14)

## MEMORANDUM DECISION

Petitioners, Father J.A. and Mother N.W., by counsel Jeremy B. Cooper, appeal the Circuit Court of Hampshire County's April 9, 2021, order granting ongoing visitation with respondents following petitioner mother's adoption of L.A.[1] Respondents B.M.-1 and B.M.-2, the child's biological maternal grandparents, by counsel Christopher D. Janelle, filed a response in support of the circuit court's order. The child's guardian, Lauren M. Wilson, filed a response in support of the circuit court's order. Petitioners filed a reply. On appeal, petitioners argue that the circuit court erred in permitting respondents and L.A. to have ongoing visitation following petitioner mother's adoption of the child.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the governing law, the briefs, and the record presented, the Court finds that the circuit court erred in granting respondents continued visitation with L.A. without making findings that demonstrate a granting of substantial weight to petitioners' wishes or fully analyzing the factors set forth in West Virginia Code § 48-10-502. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure, and a memorandum decision is appropriate to vacate, in part, and remand the matter for further proceedings consistent with this decision.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because respondents share the same initials, we will refer to them as B.M.-1 and B.M.-2, respectively, throughout this memorandum decision.

1

Prior to the initiation of the current proceedings, petitioner father and the child's biological mother were involved in family court proceedings concerning custody of the child. In March of 2017, petitioner father was granted primary custody of the child, while the mother was permitted supervised visitation based on her past failures to follow the child's dietary restrictions, which resulted in health problems for the child. In that same order, the family court granted respondents visitation with the child for one weekend per month. However, the family court was clear that "visitation with [respondents] is temporary and has occurred only because the mother's time with the child is necessarily restricted."

In June of 2020, petitioners filed a petition for adoption. Petitioner father provided his consent for the child's stepmother, co-petitioner herein, to adopt the child. The following month, the child's biological mother filed an answer to the petition. In October of 2020, the guardian filed a report in which she recommended that the stepmother be permitted to adopt the child. In November of 2020, respondents filed a motion to intervene. The following month, respondents filed a motion for contempt upon allegations that they had not been permitted to exercise their visitation with the child. According to the record, although respondents and petitioner father were in agreement at the onset of the COVID-19 pandemic that visitation should be suspended, the visits remained suspended from March of 2020 through May of 2020, after which petitioners filed their motion for adoption.

In January of 2021, the court held an evidentiary hearing, during which it heard testimony from Cpl. Phoebe Lahman of the Hampshire County Sheriff's Office; Jerrilyn Jackson, counselor for L.A.; and petitioner father. Cpl. Lahman conducted the adoption home study of petitioners' home and ultimately recommended that the adoption be granted. According to Cpl. Lahman, the child was "very happy and healthy," the "residence was clean and suitable for the child," and neither petitioner "had any known criminal history or prior calls for law enforcement to respond to." Because the biological mother did not consent to the adoption, the court then turned to the issue of whether appropriate grounds for adoption existed and whether it would be in child's best interest. According to the evidence, the mother had not seen the child since October of 2017, was in arrears on her child support obligation, and had abandoned the child. The court also took notice of prior family court orders in which the mother was found to have failed to follow medical advice concerning the child's dietary restrictions, which caused L.A. to suffer symptoms of gastric distress, pain, and other gastrointestinal problems.

As it relates to respondents' visitation, Ms. Jackson authored a letter concerning her therapy with L.A. in which she explained that L.A. initially presented with outbursts and anxiety related to interactions with extended family. However, Ms. Jackson indicated that L.A.'s demeanor and attitude improved following restrictions on visitation with respondents necessitated by the COVID-19 pandemic. According to Ms. Jackson, L.A. appeared to be more relaxed and expressed that she "feels less nervous since she does not have to attend visits with [respondents]." L.A. reported that while at respondents' home she "heard mean things about [petitioners]" and that she was asked not to share what respondents said, which caused the child to feel like she was "keeping secrets." According to L.A., after visitation ended, she felt like "a monkey was on her back and now it's gone."

2

During her testimony, Ms. Jackson corroborated the contents of her letter, indicating that L.A. was having behavioral issues when she began treatment, but that the child had improved dramatically. The counselor testified that visitation with respondents was the cause of these issues, as the child expressed confusion over her visits with respondents. Specifically, "[o]ne particular incident that caused [L.A.] trauma was hearing that [petitioners] would be getting a divorce which was not the case." According to Ms. Jackson, L.A. reported that respondents told her about the divorce. Additionally, L.A. said that respondent grandfather called her a liar when confronted with the accusation that he misled the child about the divorce. Ms. Jackson testified that L.A. "talked about feeling increasingly nervous" about visitation "after the incident where she felt that her grandfather called her a liar."

Further, the counselor testified about L.A.'s disclosures that respondents asked her not to talk to her parents about certain things that were said and how this secrecy had a negative impact on the child and her behavior. Ms. Jackson also explained that because of the child's dietary restrictions, she was always worried about what type of food she would be given during visits. According to Ms. Jackson, L.A. "talked about feeling not believed or trusted about her physical health issues" when it came to visits. Specifically, Ms. Jackson explained that her understanding of the situation was that respondents were aware of L.A.'s dietary restrictions, but that the child was concerned "they were going to make her eat things she wasn't allowed to have." Ms. Jackson also testified that L.A.'s behavior improved after visitation ceased, as the child became "more of a kid" as demonstrated by her increased laughter and happiness during sessions. According to Ms. Jackson, the child's reported outbursts decreased after visits with respondents ceased. Despite Ms. Jackson's extensive testimony about the effect of visitation on L.A., she testified that she did not have an opinion on whether visitation should be ongoing, "[o]ther than [L.A.] has talked about feeling better since she has not gone." Ms. Jackson followed this by clarifying that she "would [not] be getting in the truth or falsity of the matter" for purposes of the hearing.

Petitioner father also testified and confirmed that L.A.'s behavior improved after visits with respondents ended, which caused him to choose to deny them further visitation in the child's best interest. Petitioner father also confirmed that L.A. told petitioners that respondents told her petitioners would be getting divorced, and when petitioner father confronted respondent grandfather about the issue, the grandfather called L.A. a liar. Petitioner father detailed other ways in which respondents interfered with his ability to parent the child, including respondents telling L.A. that she did not have to listen to petitioner mother and fostering a rebellious attitude by telling the child that petitioners were wrong to ask her to behave. Petitioner father further acknowledged that visitation with respondents was generally a good experience, that respondents love L.A., and that L.A. loves them. The matter was ultimately continued.

In February of 2021, the parties appeared for a final evidentiary hearing on the petition for adoption and respondents' contempt issues. The court heard testimony from petitioner stepmother, L.A.'s mother, both respondents, and the child's guardian. Petitioner mother referred to L.A. as an anxious child who had suffered past traumas, but testified that L.A.'s behavior improved after visits with respondents ceased.

3

Respondent grandmother testified to her relationship with L.A. According to the grandmother, before any of the extended court proceedings involving the child, petitioner father and L.A. would frequently visit respondents' home and L.A. would stay with them while petitioner father worked. Respondent grandfather testified and denied telling L.A. that petitioners would be getting a divorce.

The child's guardian also testified, and confirmed that L.A. and respondents have a mutually loving and beneficial relationship. According to the guardian, L.A. has a strong bond with respondent grandmother. The guardian recommended that visitation continue if the adoption were granted, subject to limitations regarding the biological mother.

Ultimately, the court found that adoption was necessary because of the mother's abandonment of L.A. and because reintroducing the mother into the child's life would be detrimental to the child. As such, the court found that it was in the child's best interest to terminate the mother's parental rights and to deny the mother post-termination visitation. The court then turned to respondents' motion for visitation and associated contempt issues. The court noted that although L.A.'s counselor made no recommendation about whether visits with respondents should continue, she did observe a noticeable positive difference in L.A.'s behavior after visitation ended. The court found that, based upon that information, petitioner father consciously chose not to continue visits because he believed it would be in the child's best interests. Because of "the unusual circumstances presented in this case caused by the coronavirus pandemic," the court declined to hold petitioner father in contempt for any "alleged violations" of the family court's 2017 order regarding grandparent visitation. The court found, however, that the guardian recommended continued visits between respondents and the child, especially considering that the child has a significant bond with respondent grandmother. As such, the court awarded respondents one weekend per month of visitation with L.A. and also ordered that L.A. be permitted visits with her half-sibling during visits with respondents. The court also imposed the following restrictions: (1) respondents shall not permit the biological mother to have contact with the child, including third-party communications, gifts, letters, phone calls, or any other communication; (2) respondents shall not make any disparaging remarks about petitioners during visits; (3) respondents shall follow all therapeutic recommendations from L.A.'s counselor in processing her adoption with regard to contact with her half-sibling; (4) and prior to any visits between respondents and L.A., all parties shall meet with L.A.'s counselor to develop an appropriate transition plan for visits. It is from this order that petitioners appeal.

The following standard of review applies to matters such as these:

> "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syllabus point 2, *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

Syl. Pt. 1, *In re the Adoption of Jon. L.*, 218 W. Va. 489, 625 S.E.2d 251 (2005). Further, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an

4

interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 2, *In re Visitation of A.P.*, 231 W. Va. 38, 743 S.E.2d 346 (2013) (citation omitted). We now turn to petitioners' specific arguments on appeal.

According to petitioners, the lower court failed to accord any weight—let alone special weight as required by *Troxel v. Granville*, 530 U.S. 57 (2000)—to their objection to the grandparent visitation continuing. Upon our review, we agree, as the record contains no findings related to petitioners' position concerning ongoing grandparent visitation. As we have explained, "in light of the *Troxel* decision it is clear that 'the court must accord at least some special weight to the parent's own determination' provided that the parent has not been shown to be unfit." *State ex rel. Brandon L. v. Moats*, 209 W. Va. 752, 763, 551 S.E.2d 674, 685 (2001) (quoting *Troxel*, 530 U.S. at 70). Despite this instruction, neither the order on appeal nor any transcript in the appendix record contain anything that shows the court afforded any weight, let alone special weight, to petitioners' position on continued visitation.

Further compounding this error is the fact that the circuit court addressed only a few of the many factors a court is required to consider in determining if grandparent visitation is appropriate. We have previously explained that "[t]he Grandparent Visitation Act, W.Va. Code § 48-10-101 et seq. [2001], is the exclusive means through which a grandparent may seek visitation with a grandchild." *A.P.*, 231 W. Va. at 38, 743 S.E.2d at 347, Syl. Pt. 3 (citation omitted). According to West Virginia Code § 48-10-502,

> In making a determination on a motion or petition the court shall consider the following factors:
> (1) The age of the child;
> (2) The relationship between the child and the grandparent;
> (3) The relationship between each of the child's parents or the person with whom the child is residing and the grandparent;
> (4) The time which has elapsed since the child last had contact with the grandparent;
> (5) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;
> (6) If the parents are divorced or separated, the custody and visitation arrangement which exists between the parents with regard to the child;
> (7) The time available to the child and his or her parents, giving consideration to such matters as each parent's employment schedule, the child's schedule for home, school and community activities, and the child's and parents' holiday and vacation schedule;
> (8) The good faith of the grandparent in filing the motion or petition;
> (9) Any history of physical, emotional or sexual abuse or neglect being performed, procured, assisted or condoned by the grandparent;
> (10) Whether the child has, in the past, resided with the grandparent for a significant period or periods of time, with or without the child's parent or parents;
> (11) Whether the grandparent has, in the past, been a significant caretaker for the child, regardless of whether the child resided inside or outside of the grandparent's residence;

(12) The preference of the parents with regard to the requested visitation; and

(13) Any other factor relevant to the best interests of the child.

In the order on appeal, the court addressed only a few of these factors and the findings that were made are limited and conclusory. For example, the court simply concluded that L.A. "does have a significant bond with her grandmother . . . and it is in the best interests of the minor child to continue to have visitation with her grandparents." This finding is confusing, because the court also found that the child's counselor "observed there to be a noticeable difference in L.A.'s behaviors after the visitations ceased" and that the child's "behaviors improved significantly." Because the court did not further elaborate on its conclusion that continued visitation with respondents is in the child's best interests, it is difficult to reconcile these findings. Given that the only evidence to which the court cites in support of its findings demonstrates that the child's visitations with the grandparents negatively impacted her behavior and wellbeing, it is unclear why the court found that continued visitation is in the child's best interest, other than the fact that the child and respondent grandmother share a significant bond. Petitioners also argue on appeal that the court erred in finding that ongoing visitation would not interfere with the parent-child relationship and that it would be in the child's best interests. Given the analysis above concerning the clear evidence that visitation had a negative impact on the child's behavior and mental health, we reiterate that absent more detailed findings, it is difficult to find support in the record for the court's conclusion that continued visitation is in the child's best interests.

As we recently explained, "when a . . . court is presented with a petition for grandparent visitation, it must consider a number of factors and make specific, detailed findings explaining its ruling." *Meagan S. v. Terry S.*, 242 W. Va. 452, 455, 836 S.E.2d 419, 422 (2019). Further, we stressed that the legislature was explicit that a court "shall consider" the factors set forth in West Virginia Code § 48-10-501. *Id.* at 456, 836 S.E.2d at 423. In that case, the Court remanded the matter because the lower court's order "did not include any specific analysis addressing the thirteen factors" set forth above. *Id*. Similar to the matter at hand, the lower court in *Meagan S.* simply concluded that the guardian's recommendation to award visitation to the grandparents was in the minor child's best interests. *Id*. Importantly, we noted that the court "did not state which factors weighed in favor or against grandparent visitation." *Id*. We went on to reiterate that the "failure to make specific findings of fact regarding the grandparent visitation factors in W. Va. Code § 48-10-502 [is] clear error" because "'the Legislature has gone to great lengths to enumerate the factors listed in W. Va. Code § 48-10-502'" and that "'[t]hese factors should be clearly addressed in any . . . court order granting grandparent visitation rights.'" *Id*. at 456-57, 836 S.E.2d at 423-24 (quoting *Turley v. Keesee*, 218 W. Va. 231, 234, 624 S.E.2d 578, 581 (2005)).

Even more important to the matter on appeal, we found in *Meagan S.* that in addition to the failure to address the specific thirteen factors set forth in the controlling statute, the order "only included a brief mention of [m]other's 'interest in making decisions regarding the care and control of her daughter'" without going on to explain "why [m]other's interest in making decisions regarding the care of [the child] is outweighed by [the child's] interest in having a continuing relationship with [g]randparents." *Id*. at 457, 836 S.E.2d at 424. Accordingly, we explained that "[w]here the lower tribunals fail to meet this standard—i.e., making only general, conclusory or inexact findings—we must vacate the judgment and remand the case for further

6

findings and development." *Id.* (quoting *Province v. Province*, 196 W. Va. 473, 483, 473 S.E.2d 894, 904 (1996)). In this matter, we must similarly vacate the judgment and remand for the limited purpose of the circuit court's entry of an order containing detailed findings of fact and conclusions of law on the specific factors set forth in West Virginia Code § 48-10-502 and explaining what special weight has been accorded to the parents' stated position that visitation be terminated.[2] We note, however, that unlike in *Meagan S.*, further proceedings are unnecessary, as the circuit court in this matter held lengthy evidentiary hearings on the issues on appeal.

Lastly, we note that petitioners ask this Court to overturn its prior holdings in *Petition of Nearhoof*, 178 W. Va. 359, 359 S.E.2d 587 (1987), and *Brandon L.* by ruling that when a grandparent's own child has their rights terminated, all prior visitation awarded to that grandparent be vacated upon the entry of the order terminating said rights. Simply put, we decline to do so.

For the foregoing reasons, we vacate, in part,[3] the circuit court's April 9, 2021, order granting respondents ongoing visitation with the child and remand the matter for the limited purpose of the circuit court's issuance of a new order on the matter in accordance with the directions set forth herein. The court is directed to issue this order within thirty days, and the Clerk is directed to issue the mandate contemporaneously with this memorandum decision.

Vacated, in part, and remanded, with instructions.

**ISSUED**: February 1, 2022

---

[2]In their brief, respondents assert that petitioners never appealed the March 30, 2017, family court order that awarded respondents visitation and, therefore, petitioners are estopped from now asserting error in that order and in challenging their visitation generally. This argument is not compelling for several reasons, the most apparent being respondents' immediate recognition that "[u]pon the adoption proceeding, the following matters regarding grandparent visitation were at issue: the [r]espondents' pending petition for contempt, the [r]espondents' motion to intervene in the adoption, *and the [r]espondents' request for visitation to continue even if the adoption were to be granted*." By their own admission, respondents make it clear that the question of whether they would be permitted additional visitation pending the adoption was one to be resolved in the order on appeal. As such, it is clear that despite having never appealed from the family court's prior order awarding temporary visitation with respondents, the ultimate question of whether visitation would be permitted to continue post-adoption was clearly resolved in the order on appeal and is, therefore, appropriate for consideration in the current matter.

[3]The order on appeal also terminated the biological mother's parental rights to the child and permitted petitioner mother to adopt the child. Nothing in this memorandum decision should be construed as disturbing those rulings, as those portions of the circuit court's order are not vacated and remain in full force and effect.

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton